JOHN R. BAILEY
Nevada Bar No. 000137
DENNIS L. KENNEDY
Nevada Bar No. 001462
BRANDON P. KEMBLE
Nevada Bar No. 011175
BAILEY❖KENNEDY
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148
(702) 562-8820  Telephone
(702) 562-8821  Facsimile
jbailey@baileykennedy.com
dkennedy@baileykennedy.com
bkemble@baileykennedy.com

BIJAN AMINI (Admitted Pro Hac Vice)
LITA BETH WRIGHT (Admitted Pro Hac Vice)
JASON LEVIN (Admitted Pro Hac Vice)
STORCH AMINI & MUNVES PC
140 East 45th Street
New York, NY 10017
(212) 490-4100 Telephone
(212) 490-4208 Facsimile
bamini@samlegal.com
lbwright@samlegal.com
jlevin@samlegal.com

*Attorneys for Plaintiff*
JOHN P. BRINCKO, Chapter 11 Trustee

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JOHN P. BRINCKO, as Chapter 11 Trustee of Debtor National Consumer Mortgage, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>RIO PROPERTIES INC.,<br><br>Defendant. | 2:10−cv−00930−PMP−PAL<br><br>**OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION DEFENDANT RIO PROPERTIES INC.'S TWO MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE TRUSTEE'S COUNTER-MOTION FOR SUMMARY JUDGMENT ON HIS FRAUDULENT CONVEYANCE CLAIMS, FOR SANCTIONS PURSUANT TO RULE 37(c) AND DISMISSING RIO'S GOOD FAITH DEFENSE**<br><br>**FILED UNDER SEAL PURSUANT TO COURT ORDER DATED AUGUST 11, 2011. (Docket No. 181)** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I.  INTRODUCTION ............................................................................................... 1

II. TRUSTEE'S STATEMENT OF UNDISPUTED FACTS ...................................... 6

    A.    NCM ........................................................................................................ 6

    B.    Favata Dominated and Controlled NCM Fully Vested With Actual Authority ........... 6

    C.    NCM's Investment Scheme:  Favata Was No "Rogue Employee" ............................... 8

    D.    Favata Operates a Ponzi Scheme Through NCM ....................................................... 10

        1.  Favata Admits the Ponzi Scheme ......................................................................... 11

        2. As With All Ponzi Schemes, NCM Was Insolvent from Inception ...................... 13

            a.  NCM's Assets and Liabilities ....................................................................... 14

            b.  NCM Was Insolvent at the Time of Each Transfer to Rio ......................... 14

    E.    Favata Transfers $10,342,008 of NCM's Funds to Rio ............................................. 16

    F.    Rio Has Proffered No "Evidence" of Good Faith ....................................................... 18

        1. Rio's Non-Compliance with Federal Anti-Money Laundering Regulations .......... 19

        2. Rio's Unspecified and Unidentified Internal "Policies and Procedures" .............. 21

            a.  None of Rio's Witnesses Identify What Policies Or Procedures Were In Place .................................................................................................. 22

                i.   Sedio .................................................................................................... 23

                ii.  Amerine ............................................................................................... 25

                iii. Ortzman .............................................................................................. 27

                iv. Greenbaum ........................................................................................... 28

                v.  Pemberton ............................................................................................ 29

            vi. King ................................................................................................ 31

      3. Rio Never Questioned The Source the Funds Favata Gambled Despite Circumstances That A "Reasonable Casino" Would Regard as Suspicious ........ 32

      4. Rio Never Investigates Favata Despite Knowledge of Facts That Would Cause a Reasonable Person to Investigate Further ................................ 34

  G. NCM Files for Bankruptcy ............................................................... 35

III.      APPLICABLE LEGAL STANDARDS ................................................ 36

IV.      ARGUMENT

I. SUMMARY JUDGMENT IN FAVOR OF THE TRUSEE ON HIS FRAUDULENT CONVEYANCE CLAIMS IS WARRANTED ........................... 37

  A. The Transfers Were Made to Rio With Actually Fraudulent Intent to Hinder, Delay or Defraud NCM's Creditors ................................................ 37

    1. Evidence of Sam Favata's Ponzi Scheme is Proof of Fraudulent Intent .................... 37

    2. Even Absent a Ponzi Scheme, the Trustee Can Establish Fraudulent Intent ............. 39

    3. Favata's Fraudulent Intent May Be Imputed to NCM ................................ 40

    4. Favata Transfers NCM's Funds to Rio ............................................ 41

  B. The Trustee Has Established that Summary Judgment Is Also Warranted on The Constructive Fraud Claims ................................................................ 42

    a. There Is Irrefutable Evidence Of Insolvency ...................................... 43

      i. The Favata Plea Agreement .................................................. 43

      ii. The Trustee Has Additional Admissible Evidence Establishing Insolvency ................................................................ 44

    b. The Reconstruction is Admissible under FRE 1006 ............................. 45

    c. The Thoroddsen Declaration is Admissible as Opinion Testimony Under FRE 701 ................................................................ 46

    d. CUFTA ................................................................ 47

VI. THERE IS NO EVIDENCE OF RIO'S GOOD FAITH, NOR CAN THERE BE .......... 48

A. Rio's Failure to Comply with Rule 26(e) Mandates A Sanction Under Rule 37(c) Precluding It From Offering Evidence Contrary To Its Sworn Interrogatory Responses and Responses to the Trustee's Requests to Admit...................48

B. Rio Had Reason to Know or Investigate the Illicit Source of the Transfers .....................50

C. Rio's Failure to Comply with Standards Mandated by Federal Law Precludes its Claim of Good Faith.....................................................................................52

D. Rio's Constructive Notice of Favata's Fraud Allows the Trustee To Recover under CUFTA ...............................................................................................53

VII.    CONCLUSION.....................................................................................................................55

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Annod Corp. v. Hamilton & Samuels,*
    100 Cal. App.4th 1286 (2002), ...................................................54 n. 26

*Asplundh Mfg. Div. v. Benton Harbor Engineering,*
    57 F.3d 1190, 1198 (3d Cir. 1995) ...........................................46

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank,*
    838 F.2d 890, 897-98 (7th Cir. 1988)........................................51

*Brave New Films 501(c)(4) v. Weiner,*
    626 F. Supp. 2d 1013, 1016 (N.D. Cal. 2009) ..........................40

*Breeden v. Kirkpatrick & Lockhart, LLP,*
    268 B.R.704, 710 (S.D.N.Y. 2001) ...................................40, 41

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.,*
    213 F.3d 474, 479 (9th Cir. 2000) ...........................................40

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.,*
    227 F.R.D. 313, 333 (C.D. Cal. 2004)......................................49

*Credit Managers Ass'n v. Federal Co.,*
    629 F. Supp. 175, 184 (C.D. Ca. 1985) ...................................45

*CyberMedia, Inc. v. Symantec Corp.,*
    19 F. Supp. 2d 1070, 1075 (N.D. Cal. 1998)............................54

*Diaz-Barba v. Kismet Acquisition, LLC,*
    08-CV-1446 BTM (BLM), 2010 WL 2079738 (S.D. Cal. May 20, 2010) ............51

*Donell v. Kowell,*
    533 F.3d 762, 770 (9th Cir. 2008)......................................43, 47

*Foster v. Arcata Assocs., Inc.,*
    772 F.2d 1453, 1462 (9th Cir. 1985) .................................37, n. 16

*Furmanite America, Inc. v. T.D. Williamson, Inc.,*
    506 F. Supp. 2d 1126, (M.D. Fl. 2007) ...................................46

*Goldberg v. U.S.,*
    789 F.2d 1341, 1343 (9th Cir. 1986)...................................45, 47

*Hayes v. Palm Seedling Partners,*
   916 F.2d 528, 536 (9th Cir. 1990) ........................................................38

*In re AFI Holding, Inc.,*
   525 F.3d 700, 704 (9th Cir. 2008) ........................................................38

*In re Acequia, Inc.,*
   34 F.3d 800, 805-06 (9th Cir. 1994).....................................................39

*In re Agric. Research & Tech. Group, Inc.,*
   916 F.2d 528, 535-36 (9th Cir. 1990)...................................................51

*In re American Way Service Corp.,*
   229 B.R. 496, 507 n.25 (Bankr. S.D. Fl. 1999) ...................................44

*In re Armstrong,*
   285 F.3d 1092, 1098 (8th Cir. 2002) .....................................................53

*In re AVI, Inc.,*
   389 B.R. 721, 736 (B.A.P. 9th Cir. 2008) .............................................51

*In re Bay Plastics, Inc.,*
   187 B.R. 315, 330 (Bankr. C.D. Cal. 1995) ..........................................47

*In re Canvas Specialty, Inc.,*
   261 B.R. 12 (Bankr. C.D. Ca. 2001) .....................................................44

*In re Cohen,*
   236 B.R. 1, 4 (B.A.P. 9th Cir. 1999) .........................................48, 54, 55

*In re Craftmart, Inc.,*
   C-93-4174-DLJ, 1994 WL 118274 (N.D. Ca. Mar. 10, 1994)..............44

*In re Evergreen Security, Ltd.,*
   319 B.R. 245, 254 (M.D. Fla. 2003).......................................................52

*In re Imperial Credit Indus. Sec. Litig.,*
   252 F. Supp. 2d 1005, 1013 (C.D. Ca. 2003) ........................................44

*In re Lake States Commodities, Inc.,*
   271 B.R. 575, 584 (Bankr. N.D. Ill. 2002) ...............................38 n. 18, 44

*In re Lewis,*
   401 B.R. 431, 437 (Bankr. C.D. Ca. 2009) ........................................44,45

*In re M & L Bus. Mach. Co., Inc.,*
    84 F.3d 1330, 1338 (10th Cir. 1996) ........................................................................51

*In re Maui Industrial Loan & Fin. Co.,*
    Adv. No. 11-90032, 2011 WL 260670 ......................................................................43

*In re Mendez,*
    Adv. No. 06-1111, 2008 WL 597280 (E.D.Cal. Feb. 29, 2008) ..............................43

*In re Model Imperial, Inc.,*
    250 B.R. 776, 797-98 (S.D. Fla. 2000) ....................................................................52

*In re Oracle Corp. Sec. Litig.,*
    No. C. 01-00988, 2009 WL 1709050 (N.D. Cal. June 19, 2009)..............................46

*In re Real Estate Assoc. Ltd. Partnership Litig.,*
    No. CV 98-7035, 2002 WL 31027557 (C.D. Cal. Aug. 29, 2002)...........................46

*In re Richmond Produce Co., Inc.,*
    195 B.R. 455, 464 (N.D. Cal. 1996).........................................................................48

*In re Slatkin,*
    310 B.R.740, 748 (C.D. Cal. 2004) ..........................................................................38

*In re Slatkin II,*
    525 F.3d 8005 (9th Cir.2008) .....................................................................38 n. 17, 39

*In re Tran,*
    301 B.R. 576, 581 (Bankr. S.D. Cal. 2003)..............................................................40

*In re United Development,*
    319 Fed. Appx. 685, 687 (9th Cir. 2009) .................................................................39

*In re Video Depot, Ltd v. Hilton,*
    186 BR 126, 134 (W.D. Wash. 1995) ................................................................51, 52

*In re Woodfield,*
    978 F.2d 516, 518 (9th Cir. 1992) ............................................................................39

*Keith v. Volpe,*
    618 F. Supp. 1132, 1161 (C.D. Cal. 1985)...............................................................45

*Kipperman v. Onex Corp.,*
    411 B.R.805, 839 (Bankr. N.D. Ga. 2009) ...............................................................44

*Kupetz v. Cont'l Illinois Nat. Bank & Trust Co.*,
  77 B.R. 754, 762 (C.D. Ca. 1987) ........................................................................48

*Lewis v. Superior Court*,
  20 Cal. App.4th 1850 (1994) ....................................................................54, 54 n. 26

*Merrill v. Abbott (In re Independent Clearing House Co.)*,
  77 B.R. 843, 871 (D. Utah 1987) ..........................................................................43

*Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*,
  345 Fed. Appx. 244, 247 (9th Cir. 2009) ..............................................................47

*Nelson v. Pima Cmty. Coll.*,
  83 F.3d 1075, 1081-82 (9th Cir.1996) ...................................................................37

*Neumeyer v. Crown Funding Corp.*,
  56 Cal. App. 3d 178, 190 (1976) ...........................................................................48

*Paddack v. Dave Christensen, Inc.*,
  745 F.2d 1254, 1259 & n.8 (9th Cir. 1984) ...........................................................45

*Radobenko v. Automated Equipment Corp.*,
  520 F.2d 540, 544 (9th Cir. 1975)) ................................................................37 n. 38

*S.E.C. v. Amazon Natural Treasures, Inc.*,
  132 Fed. Appx. 701, 703 (9th Cir. 2005) ..............................................................45

*Shalomi v. W. Techs., Inc.*,
  2:04-CV-00168, 2007 WL 1213686 (D. Nev. Apr. 24, 2007) ...............................49

*Soremekun v. Thrifty Payless, Inc.*,
  509 F.3d 978, 984 (9th Cir. 2007) .........................................................................36

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626, 630 (9th Cir. 1987) ...................................................................36, 37

*Thomas v. Baca*,
  514 F. Supp. 2d 1201, 1210 (C.D. Cal. 2007) .......................................................46

*Thornhill Publ'g Co., Inc. v. GTE Corp.*,
  594 F.2d 730, 738 (9th Cir.1979) ..........................................................................37

*U.S. v. Frantz-Waiver*,
  No. CR 02-01267(A)-MMM, 2004 WL 5642909 (C.D. Ca. Apr. 23, 2004) ..........47

*U.S. v. Gough,*
  152 F.3d 1172 (9th Cir. 1979) ..................................................... 13

*U.S. v. Johnson,*
  594 F.2d 1253, 1254-57 (9th Cir. 1979) ..................................... 45

*USCAM Liquidated Trust v. Deloitte & Touche LLP,*
  764 F. Supp. 2d 1210, 1220 (D. Nev. 2011) .............................. 41

*Warfield v. Alaniz,*
  453 F. Supp. 2d 1118, 1137-38 (D. Ariz. 2006) ..................... 38, n. 18

*Wing v. Kaye Scholer,*
  *LLP,* No. 2:09-CV-371, 2010 WL 5020576 (Dec. 3, 2010) ............ 44

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.,*
  259 F.3d 1101, 1106-07 (9th Cir. 2001) .................................... 49

## Statutes And Other Authorities

CUFTA § 8(a) ............................................................................ 54, 55

CUFTA, § 548(a)(1)(B) .................................................................. 47

CUFTA, § 3439.02(a) ..................................................................... 43

CUFTA, §§ 3439.04(a)(2)(A-B) & 3439.05 ..................................... 43

31 C.F.R. § 103.21 ........................................................................ 19

31 C.F.R. § 103.64 .................................................................. *passim*

FED. R. CIV. P. 26(e) .................................................................. 48, 49

FED. R. CIV. P. 37(c) ......................................................... 1, 2, 49, 50

FED. R. CIV. P. 37(c)(2) .................................................................. 49

FED. R. CIV. P. 56 .......................................................................... 37

FED. R. CRIM. P. 11(e) ................................................................... 13

FED. R. EVID. 1006 ................................................................... 45, 46

FED. R. EVID. 701 ................................................................................................46

11 U.S.C. § 548(a)(1)(A)........................................................................................37

11 U.S.C. §548(a)(1)(B)(i)-(ii) ..............................................................................42

11 U.S.C. § 550(b)...........................................................................................48, 54

COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 65.20[1] (2011).........................................48

Plaintiff John P. Brincko ("Plaintiff" or "Trustee"), as Chapter 11 Trustee of the debtor National Consumer Mortgage, LLC ("NCM" or the "Debtor"), by and through his undersigned counsel of record, hereby submits this omnibus memorandum of points and authorities in opposition to Defendant Rio Properties, Inc.'s ("Rio") Motion for Summary Judgment With Respect to the Trustee's Affirmative Claims for Actual and Constructive Intent Fraudulent Transfer and Rio's Motion for Summary Judgment on the Good Faith Defense, both dated August 15, 2011, and in support of the Trustee's Counter-Motion for Summary Judgment on his Fraudulent Conveyance Claims, Summary Judgment dismissing Rio's Good Faith Defense, and for sanctions pursuant to FED. R. CIV. P. 37(c).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Trustee agrees with Rio about one thing – this is not a complicated case.  Between 2001 and March 2006, Salvatore "Sam" Favata ("Favata"), already a convicted felon, stole over $30,000,000 from unsuspecting investors in a classic Ponzi scheme that he operated through the Debtor, National Consumer Mortgage, LLC ("NCM").  As Favata admitted in a plea agreement, NCM made "lulling payments" to old investors with money he fraudulently induced new investors to entrust to NCM to prop up a phony real estate investment scheme and avoid detection.  He often convinced investors to roll over their "investments" as well, also to prop up the scheme from collapse and avoid detection.  The purpose of the Ponzi scheme was to fund Favata's lavish lifestyle, keep afloat NCM's "legitimate" mortgage brokerage business, and feed his insatiable gambling addiction, which he indulged at Rio.  These facts, underlying a classic Ponzi scheme, are undisputed.

In defense, Rio tries to paint a picture of NCM as two separate businesses, arguing that NCM's "private money division" (the Ponzi scheme led by Favata) operated independently from the legitimate mortgage brokerage business, ostensibly led by Favata's wife, Sandra Favata

("Sandra").  To the contrary, the undisputed documentary evidence, corroborated by Sandra's

testimony, establishes that the legitimate business and Ponzi scheme operated as one business,

and Favata ran all of it with actual authority.

For example, Sandra, NCM's majority owner, described the investment contracts

underlying the Ponzi scheme as "investments in NCM," not a separate "private money division"

of NCM.  As Sandra has admitted, both Favata and she signed the investment contracts on behalf

of "National Consumer Mortgage, LLC," not just the "private money division."  The investment

contracts Sandra and Favata signed promised NCM's investors that, *inter alia*:

> **The signatures below will serve as a binding legal contract between**
> **[investor] & Sam & *Sandra Favata/National Consumer Mortgage,***
> ***LLC.  This short-term note contract is secured and guaranteed by***
> ***National Consumer Mortgage, LLC.***

With Sandra and Favata signing the investment contracts confirming the binding nature of the

contract on behalf of both NCM and them, the notion that the Ponzi scheme operated separately

from the "legitimate" business is simply not supported by any competent evidence.

Then there is the undisputed fact that from inception, the proceeds of the "private money

division" and mortgage brokerage business were commingled in one common operating account.

NCM kept virtually no books and records for either "arm" of the "business," much less separate

books for each "business."  Favata and Sandra also admit that the proceeds of the Ponzi scheme

were used to "operate and expand" NCM's legitimate business.  At all relevant times, the

magnitude of the financial activity of the Ponzi scheme dwarfed the income generated by the

"legitimate" business.  NCM's "legitimate" business was, in fact, never profitable in its own

right, and it certainly never made enough money such that NCM's assets ever exceeded its

liabilities, much less during the period the transfers to Rio were made.

The undisputed evidence also establishes that Sandra delegated to Favata exclusive

control over all of NCM's financial matters and the "profitability" of both arms of the business.

While Favata's mother, Dorothy Morrisette, is a minority owner of NCM and was the sole

1   signatory on NCM's operating account, no one disputes that Favata had complete control over

2   NCM's check book.  Nor was Dorothy ever involved in NCM's day-to-day operations.  Her sole

3   purpose was to sign NCM checks in bulk and in blank, and give them to Favata to fill out,

4   because neither Sandra nor Favata could open a bank account due to their own tarnished credit

5   history.

6          Between September 2003 and March 2006, Favata diverted over $10,000,000 –

7   approximately one third of the illicit proceeds of the Ponzi scheme – from NCM and its creditors

8   to Rio.  In 2003, Favata was an "unrated player" at Rio.  By 2005, he had earned Rio's highest

9   "Seven Star Rating," and was regarded as of one of its most valued customers.  In 2005 alone,

10  Favata wagered approximately $40,000,000 at Rio, including winnings he re-wagered until he

11  lost all of it.  Rio's management may have informally monitored Favata's gambling activity as it

12  escalated, but only to the extent that it affected the Sports Book's or the casino's bottom line.

13  Rio readily admits that it never took any steps to investigate the source of the funds Favata was

14  gambling with, even though there were ample signs that the source of the funds he was gambling

15  was, at the very least, questionable.

16          Among the most alarming warning signs that Rio ignored is the fact that over the same

17  time period it accepted from Favata over $10,000,000 in cashier's checks, Favata presented to

18  Rio a subprime credit card at check-in to cover his and his parties' room, meal, entertainment

19  and other incidental charges.  Favata's casino host at Rio testified that his credit card "would

20  shut down all the time" because his credit limit was *de minimus*, even though during the vast

21  majority of Favata's visits to Rio he was using hundreds of thousands of dollars in cashier's

22  checks as seed money to gamble. When Favata's credit card "shut down all the time" during his

23  stays at Rio, Favata's casino host, with Rio's management's approval, obtained a permanent

24  override of the hold on his credit card, allowing him to charge unlimited amounts to his room

25  even though Rio knew he was well over his extremely limited credit limit.  Yet, no one at Rio

1   ever inquired into why someone who wagered more than $40,000,000 in 2005 at the casino had a

2   credit card that "would shut down all the time" when his room and incidental charges exceeded

3   the low four figures.

4         Even Rio's then-Compliance Officer, David Darby, has admitted that had he known these

5   facts at the time (which he did not), they would have warranted investigation into the source of

6   the funds Favata was gambling.  But as Darby and even Rio's own experts concede, Rio failed to

7   comply with federal anti-money laundering regulations which compelled further inquiry under

8   the circumstances that Rio was supposed to have implemented in March 2003.  In fact, no one at

9   Rio can attest to precisely when before the end of March 2006, if at all, Rio developed and

10  implemented a casino-wide written risk-based anti-money laundering program that complied

11  with the new federal regulations.  Rio cannot proffer competent evidence, as it must, that it did

12  any of these things while Favata was diverting the proceeds of the Ponzi scheme to Rio.  Rio

13  cannot claim good faith or taking the transfers without knowledge of voidability under applicable

14  law when it failed to comply with federal regulations enacted to detect precisely the activity

15  Favata was engaged in – gambling with tainted proceeds from illegal conduct.

16        Putting aside, for the moment, Rio's non-compliance with applicable federal regulations,

17  Rio did not even comply with its own "policies and procedures," to the extent there were any.

18  Rio's good faith defense rests squarely on the scripted Declarations of Kevin Ortzman (Rio's

19  Rule 30(b)(6) witness on compliance issues), David Pemberton (then-Manager, Rio's Race and

20  Sports Book, where Favata gambled), Ilene Ferrara (Darby's subordinate in compliance),

21  Howard Greenbaum (Vice President Specialty Games), Teri King (Rio's then-Cage Director)

22  and Rio's expert on Nevada gaming regulations, Dennis Amerine.  The declarations are far more

23  notable for what they do not say than what they do say.  All of them, save two,[1] uniformly parrot

24  _____

25  [1] The only Rio witness who, when deposed, was able to identify one of Rio's manuals as
routinely used for training or referenced on the job is then-Rio Cage Director, Teri King, Rio's
Rule 30(b)(6) witness on Cage procedures.  And there is no dispute that the training manual,

1   that "[t]o the best of my knowledge, all of Rio's policies and procedures were followed with

2   respect to Mr. Favata."   Not one of them, including Rio's Nevada gaming expert Amerine,

3   identifies, much less describes, what those "policies and procedures" are. The reason is simple.

4   When deposed, not a single Rio witness, including the affiants in support of Rio's summary

5   judgment motion, was able to identify the written procedures, policies, internal controls and

6   training manuals that Rio stated, in sworn interrogatories, applied during the relevant time frame

7   – including Ortzman who verified the interrogatories – or state that they were followed.

8          At bottom, Rio's strategy to defend against liability here is simple – make a simple case

9   complicated.  For instance, Rio now denies the very existence of the Ponzi scheme operated

10   through NCM altogether and that property of the Debtor was transferred to Rio, challenging the

11   Trustee to prove it.  Two years ago, however, Rio's counsel told Bankruptcy Judge Theodor

12   Albert that Rio did not question then, as it does now, whether a Ponzi scheme existed altogether

13   (*See* Rio Summary Judgment Memorandum with Respect to the Trustee's Affirmative Claims for

14   Actual and Constructive Intent Fraudulent Transfer, ("Rio Fraud Trans. Memo"), filed August

15   11, 2011 at 16-18), whether property of the Debtor was transferred to Rio, nor whether Favata's

16   fraudulent intent can be imputed to NCM.  That Rio has changed course is not surprising in view

17   of the undisputed evidence supporting the Trustee's affirmative claims for actual and

18   constructive fraudulent conveyance, and demonstrating, as a matter of law, Rio's lack of good

19   faith in accepting over $10,000,000 in fraudulent transfers.  Accordingly, summary judgment in

20

21   _____

22   dated August 25, 2005, which King said was in use to train cage personnel and left in the cage as
     a reference guide up to and including 2009, used standards laid out in Nevada gaming
23   regulations that were repealed as of March 23, 2003, when the new federal regulations were to be
     implemented.  Not surprisingly, King is the only declarant in support of Rio's motion on its good
24   faith defense who does not parrot Rio's mantra that "all of Rio's [unidentified, unspecified]
     policies and procedures were followed with respect to Mr. Favata."  The other affiant, Ilene
25   Ferrara, who worked with Darby as a compliance specialist, merely gives a custodian of records
     affidavit.  She, like King, does not opine as to whether Rio complied with its policies and
     procedures, whatever they may be.

1   favor of the Trustee on both his affirmative claims and Rio's good faith defense should be

2   granted in its entirety.

3   **II.   TRUSTEE'S STATEMENT OF UNDISPUTED FACTS**

4       **A.   NCM**

5       NCM is a limited liability company organized in the State of California in 2001.

6   (Declaration of Lita Beth Wright, dated September 19, 2011, ("Wright Decl.") Exhibit B-4.)

7   According to NCM's Operating Agreement, the only members were Sandra and Dorothy

8   Morrisette, Favata's mother. Sandra, NCM's President, owned a majority 56.5% interest and

9   Dorothy owned a minority 43.5% interest. (*Id.* at NCM 0003458.) Dorothy had no involvement

10   in NCM's day-to-day affairs. (*Id.* Ex. B-11 at ¶13; Ex. B-46 41:17-22; Ex. B-47 160:11-19.)

11   Her sole role was to sign blank checks drawn on NCM's bank account, which were given to

12   Favata to fill out. (*Id.* Ex. B-11 at ¶13; Ex. B-46 at 60:19-61:6, 41:21-24.) At the time NCM

13   began operating, neither Favata nor Sandra could open a bank account (or be a signatory) due to

14   their history of bad credit and passing bad checks. (*Id.* Ex. B-47 at 235:14-236:1, 117:24-

15   118:16; Ex. 54 at 72:13-20.) They needed Dorothy to be a signatory to NCM's bank account.

16   (*Id.* Ex. B-54 at 72:21-23; Ex. B-46 at 29:12-21, 117:24-118:16, 213:4-10; Ex B-45 at 44:22-10.)

17       **B.   Favata Dominated and Controlled NCM Fully Vested With Actual Authority**

18       According to Sandra, Favata "served in the role of controller/CFO for NCM." (*Id.* Ex.

19   B-23 at ¶ 9 ("He was in charge of collecting funds, depositing funds, accounting for funds, and

20   paying vendors."); *see also id.* at ¶ 14 ("Both Dorothy and I trusted **Sam** to follow the law and

21   ***to act as an honest officer of NCM***") (emphasis added). Sandra made Favata fully responsible

22   for NCM's financial affairs and profitability. (*Id.* Ex. 46 at 142:15-20.) At the time she did so,

23   she knew that Favata was paying restitution for a felony conviction arising out of his theft of

24   escrow funds. (*Id.* Ex. B-47 at 156:18-23.) She also knew that neither Favata nor she had a

25   personal bank account. (*Id.* Ex. B-54 at 77:17-25.) NCM had only one operating account, and

BAILEY✧KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   Favata managed the log for the check registers for the bank account and no one else. (*Id.* Ex. B-

2   54 at 76:7-77:9; B-47 at 54:11-18.)

3        Funds from the "legitimate" mortgage brokerage business were at all times commingled

4   with funds from the "fraudulent" private money investment business.  (*Id.* Ex. 55 at 302:18-24.)

5   Despite being majority owner and President, Sandra would not know of NCM's finances unless

6   Favata told her.  (*Id.* Ex. B-46 at 132:5-14, 137:2-22.)  Favata never provided her with written

7   financial information about NCM, and she never asked for it.  (*Id.* Ex. B-46 at 132:5-14, 137:2-

8   22.)  Sandra did not know the financial state of NCM at any given time.  (*Id.* B-46 at 136:8-13.)

9   NCM's receptionist delivered NCM's mail to Favata – no mail was designated for Sandra. (*Id.*

10   Ex. B-46 at 155:11-19.)  Although Sandra "gathered up [NCM's] books and records at the end of

11   each year, as kept by Sam Favata, and physically gave them to the accountant that prepared

12   NCM's annual tax returns[,] [t]here was no analytical component to this task."  (*Id.* B-23 at ¶15.)

13        On the other hand, Sandra knew that NCM funds were used for her and Favata's personal

14   use. (*Id.* B-46 at 200:2-19.)  Sandra knew that Favata was paying her personal bills, which she

15   never looked at, with NCM's money.  (*Id.* B-46 at 145:8-14.)  Favata, not Sandra, established

16   the compensation for all NCM personnel, including his own and Sandra's. (*Id.* B-47 at 176:13-

17   10.)  In 2003, she did not receive any compensation directly from NCM.  All she received was

18   cash from Favata that she knew came from NCM, his sole source of funds. (*Id.* B-47 at 177:25-

19   178:9.)  Sandra also knew full well that NCM paid the mortgages on the two homes "owned" by

20   Dorothy, one of which she lived in with Favata.  (*Id.* B-23 at ¶17.)

21        Finally, a comparison of the total funds received by Favata, Sandra and Dorothy over the

22   five year history of NCM speaks volumes.  According to NCM's bank records, Favata received a

23   total of $18,000,000, Sandra received a total of $176,033.07 and Dorothy received a total of

24

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    $963,658.08.[2] (Declaration of Thora Thoroddsen, dated September 16, 2011 ("Thoroddsen

2    Decl."), Ex. D-7.)

3        **C.    NCM's Investment Scheme: Favata Was No "Rogue Employee"**

4        According to Sandra, "NCM [wa]s a mortgage brokerage business that started offering

5    investment opportunities to individuals in 2001," shortly after the company was formed.  (Wright

6    Decl. Ex B-12 at ¶2; Ex. B-47 at 234:15-235:2; 237:10-238:20.)  Her own sworn description of

7    the Ponzi scheme's "investment opportunities" in NCM does not in any way distinguish that

8    aspect of NCM's business from the legitimate mortgage brokerage business. (Id.)  Her own

9    sworn statements also confirm her involvement in the Investment Contracts that formed the basis

10   for the Ponzi scheme.  In contrast, the only evidence Rio offers that Favata's activities were

11   unauthorized by NCM or its owners is Favata's word, with no corroborating evidence.  In the

12   face of Sandra's sworn statements to the contrary, the Investment Contracts demonstrate

13   conclusively that Rio's reliance on Favata's testimony is insufficient to raise an issue of fact that

14   Favata was not acting within the scope of his employment when he perpetrated the fraud.

15       In fact, Sandra knew how the Investment Contracts worked (Id. Ex. 47 at 237:15-238:20),

16   and described them, under oath, as "investments *in NCM*."  (Id. Ex. B-12[3] at ¶ 2) ("The

17   investments *in NCM* were documented in a contract known as a Short-term Note Contract [(the

18   "Investment Contracts")])" (emphasis added).  Sandra prepared the Investment Contracts on the

19   computer in accordance with Favata's instructions.  (Id. Ex. B-46 at 74:1-22.)  Sandra and Favata

20   both co-signed most[4] of the Investment Contracts on behalf of "National Consumer Mortgage,

21

22   _____

23   [2] $463,219 of the funds attributed to Dorothy went to paying the mortgages on the homes that
     she and her son and daughter-in-law lived in.

24   [3] Because of the enormous volume of the investment contracts underlying the scheme,
     approximately 516, only a sample of the Investment Contracts are attached as Ex. B-2 to the
     Wright Decl.

25   [4] Of those investment contracts on NCM letterhead, at least 96% of them were signed by both
     Sandra and Favata.  Additionally, there were approximately 1.5%, from the 2001 time frame, on
     "NCI" letterhead that were signed by Favata only. [Id. B-2].

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

LLC," (*Id.* Ex. B-2 at NCM 0000002; Ex. B-47 at 241:3-12; Ex. B-13 3/2/04 at ¶5 (referencing "the Contract entered into between Magid and NCM . . . .")), not any so-called "private money division" or other subdivision of NCM.

Sandra met with investors together with Favata and, along with him, explained the terms of the investment contracts. (*Id.* Ex. B-12 at ¶5) ("A meeting was set up, and *I, along with Sam Favata and Kris Thornton, met with [the investor]* at his home *to discuss the [I]nvestment Contract. We explained* to [the investor] that the investment return on the Contract was 21% for three years which equates to 7% per year") (emphasis added). According to Sandra, when NCM solicited potential investors, "[i]t [was] always [] *NCM's* policy to provide full disclosure of its investment program when approaching [them.] All questions [we]re answered and no information [was] withheld." (*Id.* Ex. B-12 at ¶2) (emphasis added). No one disputes now that NCM did not make "full disclosure of its investment program" to at least the 225 investors listed on NCM's bankruptcy schedules, (*Id.* B-22) (totaling over $32,000,000 of NCM's liabilities), or that information was withheld from them.

Each of the contracts co-signed by Sandra and Favata on NCM's behalf contains the following language just above the signature lines:

> **This short-term note contract shall be due and payable on the above indicated due date. The signatures below will serve as a binding legal contract between [investor] & Sam & Sandra Favata/National Consumer Mortgage, LLC. This short-term note contract is secured and guaranteed by National Consumer Mortgage, LLC.**

(*Id.* Ex. B-2 at NCM 0000002) (bold in original.) Many Investment Contracts signed by Sandra and Favata also include the following additional language:

> **This short-term note contract is secured by real estate and guaranteed by both real property and National Consumer Mortgage, LLC. All investment properties are based on loan to value ratios of 65% or lower, this will ensure National Consumer Mortgage, LLC and involved investors that [sic] we have room to be paid off, in the event of foreclosure.**

1   (*Id.* Ex. B-2 at NCM 0000007) (bold in original).  As it turns out, none of those representations

2   and promises that Sandra and Favata made to investors on NCM's behalf, and in writings signed

3   by them, were true.  In fact, despite her sworn statement that "full disclosure of [NCM's]

4   investment program" was made to investors and "no information was withheld[]" (*Id.* B-12 ¶2),

5   or her contractual promise in the Investment Contracts that they were "secured by real estate and

6   guaranteed by both real property and National Consumer Mortgage, LLC" (*Id.* Ex. B-2 at NCM

7   0000007) (bold in original), Sandra testified that she never researched whether the Investment

8   Contracts were actually secured by real estate. (*Id.* B-46 at 88:4-11.)

9       Taking all of these undisputed facts into account, Sandra was, at the very least, reckless

10   or blindly ignorant when she made sworn statements that "it has always been NCM's policy to

11   provide full disclosure of its investment programs" to potential investors, or promised, in the

12   Investment Contracts between *her*, Favata and NCM, on the one hand, and the investors on the

13   other, that the investments were secured by real estate and "guaranteed by National Consumer

14   Mortgage, LLC."  At most, she was complicit in the scheme.   As shown below, the Trustee need

15   not prove which one was the case to impute to NCM the fraudulent intent admitted in Favata's

16   Plea Agreement.  Either way, the undisputed evidence shows that, as a matter of law, when

17   Favata solicited the "investments in NCM," he acted on NCM's behalf with, at the very least,

18   apparent or ostensible authority. That is more than enough under governing law.

19       **D.      Favata Operates a Ponzi Scheme Through NCM**

20       On its summary judgment motion, Rio retracts its prior representation to the Bankruptcy

21   Court about what issues remain in dispute regarding the Ponzi scheme.  Nearly two years ago,

22   when the Honorable Theodor Albert asked Rio's counsel at a hearing: "[a]re you really wanting

23   to take discovery whether this is a [P]onzi scheme?", Rio replied to Bankruptcy Judge Albert that

24   the only open issues in its mind were: (1) *when, temporally, the "[P]onzi scheme became*

25   *established with respect to when transfers were made that were ultimately received by the Rio* .

1  . . [a]nd [(2)] to what extent the Ponzi scheme permeated the entire business[,]" (*Id.* Ex. B-63 at

2  8:12-9:9) (emphasis added) ("Your Honor, the simple matter of the financial statement and the

3  issue of Mr. Favata's intent at any given time is that ***it's not clear from the plea as to exactly***

4  ***when this became a [P]onzi scheme and when that issue arose.*** Mr. Favata's testimony at his

5  deposition was, in fact, that it was initially a good business that ***he*** took astray at ***some point that***

6  ***was not fully determined***"). Back then, Rio recognized that the existence of Ponzi scheme was,

7  in fact, undisputed and "established," as was the fact that NCM's funds were transferred to Rio.

8    Now, two years later, Rio challenges the Ponzi scheme's very existence by simply saying

9  it never happened without offering any competent evidence negating the vast documentary

10  record of the fraud produced in discovery.  In addition to Favata's admissions in both his Plea

11  Agreement and his deposition testimony, the Trustee produced or made available to Rio all

12  source documents demonstrating the fraud, including, but not limited to, all of NCM's bank

13  records from inception through the filing of the bankruptcy petition (Thoroddsen Decl. Exs. D-3,

14  D-4, D-5), the bankruptcy petition itself (Wright Decl. Ex. B-22), deposits (Thoroddsen Decl. D-

15  10), cancelled checks (*Id.* D-11), Investment Contracts with the unsuspecting investors (Wright

16  Decl. B-2), contemporaneous records concerning the mortgages brokered  by NCM and tallying

17  the commission income received from such transactions as reflected on the bank statements and

18  deposits (Thoroddsen Decl. Exs. D-3, D-4, D-5, D-10) and cancelled cashier's checks deposited

19  in Rio's operating account (*Id.* D-11.) The Trustee also produced a reconstructed general ledger,

20  balance sheets, profit and loss statements and tax returns he filed for NCM.  (*Id.* Ex. D-6.)

21  **1.    Favata Admits the Ponzi Scheme**

22    NCM's investment scam collapsed in early 2006, as Ponzi schemes always do.  In March

23  2006, the Securities Exchange Commission served a subpoena on NCM and seized Favata's

24  computer.  On April 20, 2006, Favata surrendered to law enforcement authorities. (Wright Decl.

25

1    B-54 at 16:25-17:17), and Favata pled guilty to one count of mail fraud on September 7, 2006

2    (*Id.* Ex. B-25)  On July 2, 2007, he was sentenced to a five year prison term.  (*Id.* B-26.)

3        In support of his Plea Agreement, Favata admitted the basic, undisputed facts[5] underlying

4    the fraud perpetrated through NCM.  He admitted that he knowingly made false representations

5    about the nature of the investments to investors to induce them to invest.  He admitted that he

6    lied to investors about the investment contracts being secured by real estate that did not exist.

7    And he admitted that he solicited new investors to pay off old investors to avoid detection:

> . . . . beginning in early 2000, ***Favata falsely represented that NCM directly loaned money at high rates of return to borrowers who required short term credit to fund real estate developments, construction projects, and other ventures.***  Favata falsely told investors that they could purchase the notes that secured these loans and thus acquire the right to collect the interest payments from the borrowers.  Referring to this opportunity as private money note investments, Favata falsely assured investors that their principal, i.e., the funds used to purchase the note, would be returned once the borrower paid the loan from NCM.  ***At the time he made these representations, Favata knew that the purported private money note investments that he offered to investors simply did not exist.  Favata, in fact, had neither the means nor the intention of investing his clients['] money as promised.***
>
> ***To conceal, however, the fictitious nature of the investment opportunity, Favata provided false and fraudulent assurances to his investors*** concerning the private money note scheme.  For instance, ***Favata falsely promised investors that his private money notes generated substantial rates of return and that NCM would periodically pay these returns to the investors over the life of the note.***  Moreover, ***Favata falsely represented that real property secured each private money note that he offered for sale through NCM.***  Favata also falsely told investors that the value loan-to-value ratio of the real property was no more than 65%.  To lend further credence to the scheme, Favata falsely told investors that he had substantial experience managing investments for other individuals.

---

[5] The Plea Agreement explicitly provides that "[i]t is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to defendant that relate to that conduct."  (*Id.* Ex. B-25 at 4:8-11.)

> *Relying on these fraudulent representations and promises, hundreds of investors gave sums totaling millions of dollars to Favata to invest in private money notes.* Rather than investing this money as promised, *Favata diverted his clients' funds to his own personal benefit, including:* to purchase his home in Yorba Linda, California; *to operate and expand NCM's legitimate mortgage business; and to fund lavish trips to Las Vegas, Nevada for friends and family.*

(*Id.* Ex B-25 at 4:19-6:3 (emphasis supplied.))  He also admitted the elements of a classic Ponzi scheme in the Plea Agreement:

> *Favata additionally used investor funds to prevent detection of his scheme.* In particular, *he often diverted funds from new investors to feign purported interest payments to the original investors in the scheme. As a result of these lulling payments, Favata induced many victims to reinvest their principal into the scheme rather [than] withdrawing their funds.*

(*Id.* Ex. B-25 at 5:26-6:3 (emphasis added); Ex. B-54 at 38:25-40:13)  Over the course of the fraudulent scheme, Favata diverted over $17,000,000 from NCM to his personal benefit.  (*Id.* Ex. B-22; Thoroddsen Decl. Ex. D-7)  Favata – who, when deposed in this case, reaffirmed that all of the facts in the Plea Agreement were true (Wright Decl. Ex. B-54 at 19:19-40:13)[6] – used more than half of the diversions from NCM to gamble at Rio. (*Id.* Ex. B-55 at 415:17-416:15.)

### 2.    As With All Ponzi Schemes, NCM Was Insolvent from Inception

Not even Rio disputes that NCM was insolvent at the time it filed for bankruptcy on April 3, 2006.  As is always the case with Ponzi schemes, once Favata started operating the fraudulent scheme through NCM, it was insolvent from its inception through the date it filed its bankruptcy petition on April 3, 2006.  (*Id.* Ex. B-25; Thoroddsen Decl. ¶¶29-31; Exs. D-7, D-12, D-13.)

---

[6] Even if Favata had not reaffirmed these facts, he cannot, after the fact, recant the statements admitted in his Plea Agreement. (*Id.* Ex. B-25 at 4:19-6:3); *see U.S. v. Gough*, 152 F.3d 1172, 1173 (9th Cir. 1998) (a guilty plea "admits the facts constituting the elements of the charge" and the defendant may not contradict those facts); *see also* FED. R. CRIM. P. 11(e) (after sentencing, "the defendant may not withdraw a plea of guilty or nolo contendere").

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   Sandra signed the bankruptcy petition on behalf of NCM, and "declare[d] under penalty of

2   perjury that the information provided in this petition is true and correct, and that I have been

3   authorized to file this petition on behalf of the debtor." (*Id.* Ex. B-22 at 3.) Thus, the information

4   Sandra declared to be true in the petition constitute admissions on NCM's part.

### a.   NCM's Assets and Liabilities

6       Given the nature of NCM's business, its principal asset was cash in the bank.

7   (Thoroddsen Decl.¶¶19-22, Ex. D-7.)  NCM's revenues were derived almost exclusively from

8   commission income from brokering mortgages, although some commission income also came

9   from the "investment side."  NCM never owned any real estate (Wright Decl., Ex. B-25 at 5:12-

10  5:14,) or other significant assets that came close to tipping NCM's balance sheet toward

11  solvency. (Thoroddsen Dec., Ex. D-13.)

12      In its bankruptcy petition, NCM listed its secured and unsecured creditors (both priority

13  and non-priority).  NCM identified $316,640 in secured claims, an "UNKNOWN" amount in

14  unsecured priority claims (for unpaid taxes) and $32,518,717.68 in unsecured nonpriority claims,

15  which are principally comprised of the Investment Contracts, all liabilities incurred in

16  furtherance of the Ponzi scheme (Wright Decl., Ex. B-22 at Schedules D, E and F.)  Thus, as of

17  the April 3, 2006 filing date, NCM (through Sandra, under penalty of perjury) admitted to having

18  at least $32,835,357.68 in liabilities. (*Id.*; Wright Decl., Ex. B-24 at ¶13.)  On the other side of

19  the balance sheet, NCM claimed to have a total of $1,102,135 in assets. (*Id.* Schedule B at 11 of

20  43.)  NCM's liabilities were not incurred overnight.  Nor were any of NCM's assets diverted

21  from its creditors overnight.

### b.   NCM Was Insolvent at the Time of Each Transfer to Rio

23      A review of NCM's bank statements, cancelled checks, cancelled cashier's checks and

24  the Investment Contracts confirms that at the time of each transfer, NCM's liabilities far

25  exceeded any assets.  (Thoroddsen Decl., Ex. D-13.)  And when excluding Favata's diversions

1   from NCM from the asset side of the balance sheet, as required under the Bankruptcy Code's

2   definition of insolvency, *see infra* at I. Ba., there is no question that NCM's liabilities exceeded

3   its assets each time Favata transferred the proceeds from the Ponzi scheme to Rio. (*Id.*)   As

4   reflected in the summary chart attached to the Thoroddsen Declaration as Exhibit D-12, at the

5   time of each transfer to Rio, total cash (*e.g.*, Rio's assets) less net amount owed to investors (*e.g.*,

6   total Investment Contracts less payoff and interest paid) was always negative.  (*Id.* at column

7   entitled "Cash minus net amount owed to investors")  As a result, not only did NCM at all times

8   meet the definition of balance sheet insolvency, but, absent the influx of new investors to keep

9   the scheme afloat (Wright Decl., Ex. B-54 at 5:19-6:3, 38:25-40:13), at any given time, NCM was

10  unable pay its debts as they came due.

11       By September 2003, after the Ponzi scheme was well underway (*see* Thoroddsen Dec., ¶¶

12  29-30, Ex. D-9), Favata started gambling at Rio.  (Wright Decl., Ex. B-24 at; Ex. B-40.)  From

13  August 2003 through March 2006, Favata presented 66 cashier's checks to Rio totaling

14  $10,342,008 (the "Fraudulent Transfers").  (Thorrodsen Decl., Exs. D-11 & D-9.)  The amount

15  of cashier's checks Favata presented to Rio over that two and a half year period increased

16  dramatically, peaking in 2005.  In 2003, Favata presented a total of $86,000 in cashier's checks

17  to Rio.  In 2004, Favata presented $812,008 in cashier's checks to Rio – $726,008 more than in

18  2003.  In 2005, there was a dramatic increase in the amount of cashier's checks as Favata

19  presented $7,964,000 to Rio, $7,151,992 more than in 2004.  From January through the end of

20  March 2006, Favata presented $1,480,000 in cashier's checks to Rio.  (Wright Decl., Ex. B-35 at

21  Ex. B-1; Thorrodsen Decl., D-10.)

22       Rio cites four pieces of "evidence" in support of its assertion that "[f]or at least some of

23  the time between 2003 and March 2006 [without saying when], the Debtor had substantial assets,

24  operated at a profit, and was valuable as a going concern." (Rio's Statement of Uncontested

25  Facts, U-9; Rio Fraud Trans. Memo at p. 5:16-21.) Rio relies on Favata's testimony that he was

1    offered close to $10 million for NCM.  Favata could not pinpoint when exactly this offer was

2    supposedly made. Favata's testimony about what "he"[7] was supposedly offered for NCM by an

3    unidentified person is inadmissible hearsay.  It is also irrelevant to whether NCM was insolvent.

4    Rio also relies on Favata's testimony that NCM ran a highly profitable business with purchase

5    offers from reputable companies such as Washington Mutual ("WaMu"). (Rio's Statement of

6    Uncontested Facts, U-9.) Again, the alleged WaMu offer is inadmissible hearsay. And Favata's

7    assertion that NCM ran a highly profitable business at any point in time is conclusively false, as

8    demonstrated by the Trustee's Reconstruction of NCM's bank balances and outstanding notes at

9    any given time (Thoroddsen Decl., ¶¶18-19, Exs. D-6 & D-7; Wright Dec., B-25 at pp. 4:26-

10    5:12, 5:19-6:3; B-54 at pp. 183:21-184:11.)  Next, and without any foundation for them, Rio

11    relies on three financial statements.  (Rio's Statement of Uncontested Facts, U-9 citing the

12    Declaration of Shannon Mader, dated August 11, 2011 ("Mader Decl.,") Exs. B-6, B-7, B-8.)

13    Nor has Rio provided in the record any documents from which the summary was allegedly

14    prepared.  In any event, the Debtor's actual records show all three financial statements to be a

15    false statement of NCM's financial condition. (Thoroddsen Decl. ¶¶ 17-19, Exs. D-3, D-4, D-5,

16    D-6, and D-7; Wright Decl., Ex, B-2.)

17    **E.    Favata Transfers $10,342,008 of NCM's Funds to Rio**

18         Rio boldly claims that none of NCM's funds was actually transferred to Rio, and there is

19    no evidence to support they were. (*See* Rio Fraud Trans. Memo at 12:1-14:11; *see also* Wright

20    Decl., Ex. B-29 ("Rio maintains [without explanation] that there is no evidence of any transfer of

21    funds from the Debtor to Rio[]").)  The undisputed evidence proves otherwise.

22

23

24    _____

[7] Rio's reliance on Favata's testimony about what "he" was supposedly offered for NCM is, to
25    say the least, ironic given Rio's argument that Favata's fraudulent  intent cannot be imputed to
     NCM because he just ran the "independent" "private money division." (*See* Rio Fraud Trans.
     Memo at 2, 12.)

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1        According to Sandra, NCM's "general" operating "account [] contain[ed] investor

2   proceeds and money that NCM use[d] in its daily operations." (*Id.* B-11 ¶ 8.)

3             NCM had only one "general operating account for the ongoing, day to day
          business of NCM. Creditors and investors are paid from that account, as

4             well as payroll for employees of NCM. When investors turn over funds to
          NCM for investment, the money is deposited to the general operating

5             account and then disbursed in the form of secured real estate loans. There
          are no separate accounts for individual investors.

6

7   (*Id.* at ¶ 6; Wright Decl., Ex. B-54 at 171:22-173:2.) Thus, NCM's only operating account

8   contained proceeds of the Ponzi scheme commingled with funds from NCM's mortgage

9   brokerage business. (*Id.* B-25 at p. 5:19-26; B-13 ¶ 6.) Favata then took checks that had been

10   pre-signed by his mother Dorothy, ". . . like maybe two -- 200, 300 at a time and then take it

11   back, blank checks, just signed[]" that were drawn on NCM's operating account and made them

12   payable to himself. (*Id.*, B-11 ¶ 3; B-24 ¶ 9; B-54 at 69:8-70:22, 71:22-72:11; B-38; B-46 at

13   60:19-61:6, 41:21-24; Thoroddsen Decl. D-10.) Sandra has also admitted this:

14             [s]ince Sam could not serve as an officer of the corporation due to his past
          felony conviction, [I permitted] an internal practice [to] develop[] over

15             time that was designed to promote efficiency and to allow Sam to perform
          the role of the controller/CFO. Initially, either Dorothy or I would sign

16             checks that were brought to us by Sam. However, as the volume of
          payments grew, this became unworkable. ***Instead, Dorothy or I would***

17             ***sign an entire book of checks and turn them over to Sam Favata,*** with
          the understanding that these checks would be used, in the ordinary course,

18             to pay corporate obligations, or authorized compensation. Unfortunately,
          Sam apparently did not comply with this understanding.

19

20   (Wright Decl., Ex. B-23 ¶ 10; *but see id.* at ¶ 14 ("Both Dorothy and I trusted ***Sam*** to follow the

21   law and ***to act as an honest officer of NCM***.")

22        As Rio concedes, Favata then cashed the check he made payable to him that was drawn

23   on NCM's operating account and purchased cashier's checks, also made payable to him, with the

24   proceeds. (Rio Fraud Trans. Memo at p. 7:7-8; Wright Decl., B-54 at pp. 78:9-79:10; B-74;

25   Thoroddsen Decl., D-10 and D-11.) Then, as Rio has admitted, Favata presented the cashier's

1    checks to Rio's cage, each of which Rio undisputedly deposited into its general operating

2    account. (Thoroddsen Decl., Ex. D-11.)

3        The cage is the casino's hub of financial activity with its gamblers. The cage's function

4    is to provide customer service, to provide monies to customers to gamble and to process casino

5    revenues. (Wright Decl., B-57 at p. 21:15-20; B-51 at p. 19:21-24.) It is where front money

6    accounts, including Favata's, are opened and maintained, where chips or markers are exchanged

7    for cash or credit (or in Favata's case, cashier's checks) and where gamblers collect their

8    winnings. The cage is the place at Rio where Favata transferred the cashier's checks purchased

9    with NCM's funds, albeit with the proceeds of the Ponzi scheme. (*Id.* B-57 at pp. 29:18-30:19.)

10   **F.    Rio Has Proffered No "Evidence" of Good Faith**

11       Throughout discovery, Rio's position about what constituted its relevant "policies and

12   procedures" was a constantly moving target, and took a final, contradictory turn during expert

13   discovery. In response to the Trustee's First Set of Interrogatories, the Rio stated that unnamed

14   employees made affirmative inquiries into Favata and his creditworthiness and collected

15   information regarding Favata. Specifically, Rio stated that its employees contacted Central

16   Credit, an agency that tracks gamblers' transactions with other casinos and banks. (*Id.* B-28 at

17   pp. 5-7.) Rio's responses were verified, pursuant to FED. R. CIV. P. 33, by Kevin Ortzman, Rio's

18   Rule 30(b)(6) designee concerning, *inter alia*, Rio's anti-money laundering compliance program.

19       In October 2009, after the close of general fact discovery, Rio served "Amended and

20   Restated" interrogatory responses, and withdrew its original assertion that its employees

21   contacted Central Credit.[8] Instead, Rio speculated that it "may have conducted" such inquiries,

---

[8] On October 13, 2009, also after the close of general fact discovery, Rio also amended its initial Rule 26(a) disclosures to claim, for the first time, reliance on Rio's internal policy documents regarding "1) *compliance with Nevada Regulation 6A (Currency Transaction Reporting);* 2)

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

but never identified a single Rio employee with knowledge of any alleged inquiries or "any documents indicating whether these inquiries were undertaken or not." (*Id.* B-29 at pp. 5-7.) Rio's speculation proved to be untrue. Rio's Rule 30(b)(6) witness on credit, Karlotta Sanchez, confirmed that Rio made no inquires about Favata to Central Credit, did nothing to confirm any banking information regarding Favata, and essentially made no effort to investigate the source of the Transfers or whether Favata was creditworthy. (*Id.* B-53 at pp. 44:15-17, 80:2-4, 87:11-14.) Nor did the Rio undertake an investigation as to the source of the millions of dollars that Favata gambled at the Rio, despite the fact that the first of the Transfers was a cashier's check which listed the Debtor as the purchaser. (Thorrodsen Decl., D-11.)

### 1.    Rio's Non-Compliance with Federal Anti-Money Laundering Regulations

Just as striking is the Rio's admission of its non-compliance with federal anti-money laundering regulations. Throughout fact discovery, the Rio consistently denied that it was required to develop and implement a written anti-money laundering program as required by 31 C.F.R. § 103.64 as of March 23, 2003.[9] Rio did admit, however, that as of the same date, it was supposed to report suspicious activities under 31 C.F.R. § 103.21, which replaced Nevada Reg. 6A's subjective standard for suspicious activity reporting to the federal regulations' objective standard.

---

casino cage internal controls; 3) cage and credit internal controls; 4) race and sports book internal controls and 5) "comps" provided to guests. . . ." (Compare B-70 4:6-10, with B-71 ) (emphasis added).

[9] The Federal regulation formerly codified at 31 C.F.R. 103.64 has been moved, as of March 1, 2011, to the new location 31 C.F.R. 1021.210(b) & 1021.100(a-e). Because in testimony and prior motion practice, the old citation format is used, the Trustee will continue to use the old citation format for this provision.

BAILEY❖KENNEDY
984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    In response to the Trustee's Second Set of Interrogatories, requesting that the Rio identify

2  such policies and the individuals responsible for implementing them, the Rio consistently

3  claimed that 31 C.F.R. § 103.64 was not applicable to Rio until July 1, 2007. (Wright Decl., B-

4  30 at pp. p. 9-10.)  Despite amending its responses a few months later, Rio persisted in its

5  position that it was not required to comply with 31 C.F.R. § 103.64. (*Id.* B-32 at 9-10.)  The Rio

6  also unqualifiedly denied that it was subject to 31 C.F.R. § 103.64 at any relevant time in

7

8  response to the Trustee's requests to admit. (*Id.* B-31 at p. 30.)

9    To rebut Rio's position in discovery with respect to 31 C.F.R. § 103.64, the Trustee

10  retained an expert on federal anti-money laundering regulations, Alexander Seddio, and tailored

11  his litigation strategy based on Rio's stated position in discovery.  On May 5, 2010, months after

12  general fact discovery had closed, Rio served the Expert Rebuttal Report of Courtney J. Linn.

13  (*Id.* B-36.) In that report, Rio did an about face and, for the very first time in the litigation, the

14

15  Rio took the position that, pursuant to 31 C.F.R. § 103.64, "[t]he federal requirement to maintain

16  an anti-money laundering program was first extended to casinos in 1993." (*Id.* at p. 12.)[10]  When

17  confronted at deposition with the Rio's interrogatory responses which stated that 31 C.F.R.

18  §103.64 did not apply to Rio and were sworn to be true by Ortzman, Rio's Rule 30(b)(6) witness

19  on its alleged compliance with state and federal anti-money laundering regulations, Linn opined

20  that Rio's interrogatory responses were incorrect.[11]

21

22

---

23  [10] In his report, Linn affirmatively states that "Federal BSA regulations require casinos to
establish and implement a written, risk-based AML Program reasonably designed to prevent the

24  casino from being used to facilitate money laundering and the financing of terrorism." (*Id.* 12.)
Based upon the testimony of the Rio personnel and the documents produced in this litigation, the

25  Rio failed to comply with those regulations.
[11] Specifically, when asked "Mr. Ortzman's position and this Interrogatory response, that 103.64
didn't apply to them until July 1st , 2007 . . . Do you actually believe that?"  Linn responded "I

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    Ultimately, Rio should be bound to the position it took, and subsequently reaffirmed, in

2    discovery that it was not subject to the requirements of 31 C.F.R. § 103.64.  With the time to

3    seasonably amend its discovery responses long past, Rio should not be permitted to take a

4    directly contrary position in expert discovery to its sworn interrogatories to mitigate the impact

5    of its false discovery response.  Moreover, Rio's "amended and restated" interrogatory response

6    adheres to its original position that Rio was not required to comply with 31 C.F.R. § 103.64 until

7    2007, and precluded from proffering any evidence that contradicts its sworn discovery responses.

8

9    This is especially so when Rio's admission that it did not comply with 31 C.F.R. § 103.64 is such

10   powerful evidence of the lack of good faith in accepting the transfers.

11       **2.    Rio's Unspecified and Unidentified Internal "Policies and  Procedures"**

12       In tacit recognition that Rio could not show compliance with applicable federal anti-

13   money laundering regulations, Rio's expert focuses instead on "industry standards and norms"

14   for processing and accepting cashier's checks.  Although Rio produced a number of written

15   policies and procedures concerning suspicious activity reporting in discovery, Rio has neither

16   identified nor included in the record a single policy, much less written policies and procedures,

17   with which it supposedly complied concerning Favata's undisputed transfer of over $10,000,000

18   of illicit funds to Rio.  Rio's good faith defense therefore hinges on unidentified "procedures and

19   policies" that are neither described nor included in the record supporting Rio's motion for

20   summary judgment, but supposedly conform with similarly unspecified "industry standard and

21   norms."  (*See* Affidavit of Kevin Ortzman, sworn to on August 11, 2011 ("Ortzman Aff."), ¶ 3

22   ("To the best of my knowledge, all of the Rio's policies and procedures were followed with

23   respected to Mr. Favata"); Affidavit of Howard Greenbaum, sworn to on August 12, 2011

24

25

don't think that's a legitimate – well, let me – I don't agree with that position." (Wright Decl., B-66 at pp. 159:24-160:9.)

1   ("Greenbaum Aff."), ¶ 4 ("To the best of my knowledge, all of the Rio's policies and procedures

2   were followed with respect to Mr. Favata."); Affidavit of David Pemberton, sworn to on August

3   12, 2011 ("Pemberton Aff."), ¶ 4 ("To the best of my knowledge, all of Rio's policies and

4   procedures were followed with respect to Mr. Favata"); Affidavit of Dennis Amerine, sworn to

5   on August 11, 2011 ("Amerine Aff."), at ¶ 2, 4 ("It is my opinion that Rio materially followed

6   standard industry practices and norms in connection with all of its dealings with Mr. Favata,

7   including but not limited to the acceptance and processing of the cashier's checks presented by

8   Mr. Favata . . . .")

9          **a.     None of Rio's Witnesses Identify What Policies Or Procedures Were
               In Place**

10

11          All four of Rio's affidavits purport to provide evidence of its alleged compliance with

12   "Rio's policies and procedures," without saying whether they are written or oral, or unspecified

13   "industry standard and norms" in its dealings with Mr. Favata.  They are all remarkably silent

14   about what "policies and procedures" or industry "standards and norms" Rio supposedly

15   followed.  The only exception is Amerine's assertion, without citing to any evidence, that "the

16   Rio called the issuing banks to verify that the cashier's checks were valid and outstanding with

17   no holds or stops" was consistent with industry standards and norms, and further inquiry was not.

18   (Amerine Aff. ¶ 8.)  As discussed below, Amerine's opinion that Rio satisfied its obligation to

19   investigate Favata's gaming activity or source of funds under the circumstances simply by

20   verifying the validity of the cashier's checks with the issuing bank is contrary to controlling law.

21   Even the Rio's own expert, Amerine, admitted in his deposition that further investigation was

22   required.  (Wright Decl., B-64 at pp. 293:6-294:2.)

23          In discovery, Rio and its parent company, Harrah's, produced a number of written

24   policies and internal control documents.  These documents include Rio Cashier Operations

25   Regulations 6A Training Manual, various Internal Control Systems, three versions of Rio's

     Submitted System of Internal Control for the Casino Cage (effective April 2003, July 2004 and

1    Nov. 2006) and Procedures for the Acceptance of Cashier's Checks. (Id., Exs. B-8, B-6, B-15,

2    B-3, B-43, B-20, B-21, B-5.) Amerine's deposition revealed that his opinions about Rio's failure

3    to comply with federal anti-money regulations was consistent with the Trustee's expert, Seddio.

4    None of the moving affidavits that uniformly parrot Rio's alleged compliance with "policies and

5    procedures" attach or even reference any of these written policies because these documents

6    undisputedly demonstrate that it failed to comply with 31 CFR §§ 103.21 and 103.64.

### i.    Seddio

8        Seddio is the Trustee's expert on money laundering and anti-money laundering policies

9    and procedures. Seddio, currently an independent consultant, provides expert services to the

10   legal and financial services industries in the area of fraud, money laundering and asset forfeiture.

11   (Id. Ex. B-34 at p. 2; B-65 at 42:5-43:17).[12] Seddio served as a Special Agent with the Criminal

12   Investigation Division of the Internal Revenue Service from 1978 to 2000, where he became one

13   of the government's leading figures in the effort to combat the laundering of criminal proceeds

14   through the U.S. financial system. (Id. Ex. B-34; B-65 at (Id. Ex. 65 at 25:20-26:22.) After

15   leaving government service in 2000, Seddio worked as Director of the Forensic and Litigation

16   Services practice at KPMG LLC, in San Francisco, before becoming a founding of AML

17   Specialists LLC, an expert consulting practice. (Id. Ex. B-34.)

18       Seddio's analysis of the evidence adduced in discovery revealed numerous "red flags,"

19   which identified Favata as a high-risk for potentially illicit activity, and warranted further

20   investigation. (Id. Ex. B-34 at 20-29.) These "red flags" include the fact that:

21       ■   Rio accepted from Favata 66 high-dollar value cashier's checks totaling
         $10,342,008.21 ranging in amounts from $15,000 to $350,000, without regard to the
22       potential money laundering risks. (Thoroddsen Decl. Ex. D-11), which Seddio opined
         was an obvious and historically elemental "red flag" for suspicious money laundering
23       activity (Wright Decl. Ex. B-34 at 22-23);

24

25

---

[12] Seddio authenticated his March 4, 2010 Report by Expert at his deposition. (Id. B-65 at 11:7-19.)

- Rio accepted the $10,342,008.21 in high-dollar value cashier's checks despite the fact that Favata's sub-prime credit card was "very limited" (with a low four figure charging limit), and Rio would not charge his credit card even if he ran out of cash or cashier's checks during a given trip (Mader Decl. Ex. B-40 at NGC00049; Wright Decl. Exs. B-17; B-34 at 27);

- Rio filed a January 2003 Suspicious Activity Report ("SAR") related to Favata's attempt on December 28, 2002 to avoid exceeding the $10,000 threshold for filing the Currency Transaction Report (*Id.* Exs. B-69; B-6; B-34 at 24-25; B-35);

- Despite this previously suspicious transaction, Rio allowed Favata to withdraw $1,930,201 in currency from the Rio on 117 days between October 25, 2002 and March 26, 2006, which, simply based upon the sheer volume and amounts of currency transaction should have raised concerns on the part of Rio (*Id.* B-34 at 23-24);

- Moreover, Rio consented to Favata's requests to exceed wagering limits, despite knowledge of investigations into Favata's activities by the Nevada Gaming Control Board, as well as Rio's own suspicions that Favata may have been a bookie (*Id.* Exs. B-56 at 49:15-53:5, 54:11-24; B-57 at 162:11-165:21, 166:6-14, 179:3-17; B-34 at 25-27.)

Despite all of these "red flags," Rio failed to initiate an internal investigation, or file any SARs, aside from the single SAR filed in January 2003. Seddio opined, and logic dictates, that this was because, as the documents produced by Rio reflect, Favata was a high value customer who generated in excess of $7.9 million in gross wagering income and could singlehandedly influence the bottom-line of Rio's Race and Sports book. (*Id.* Exs. B-18; B-19; B-34 at 21-22.)

### ii.     Amerine

Amerine, Rio's Nevada gaming expert, opines in his report that "the Rio Suites & Casino materially followed standard industry practices and norms in connection with all of its dealings with Mr. Favata, including but not limited to the acceptance and processing of cashier's checks presented by Salvatore Favata . . . ." (*Id.* Ex. B-33 at 3.) Amerine also opined that Rio "materially complied" with Nevada Gaming Commission regulations and corresponding

1   minimum internal control standards in relation to its dealings with Mr. Favata, including the

2   acceptance and depositing of the cashier's checks. . . ." (*Id.* at 3-4.)  Finally, Amerine offers far

3   more lengthy opinions on "ancillary issues," including suspicious activity reporting under

4   applicable federal and state gaming regulations. (*Id.* at 7-8.)

5        In his report, Amerine opines, without any citation to the record, that the "Rio established

6   a routine training program for its employees and management," and there were "certain inquiries

7   into Favata that assisted them in their assessment as to whether or not a Suspicious Activity

8   Report was required[,]" all of which are limited to the manner in which Rio accepted cashier's

9   checks from Favata. (*Id.* at 8.)  While Amerine's Report concedes that "there were some cases

10  of persons not receiving timely training and the program itself was not timely updated for

11  changes to certain [unspecified] aspects of gaming laws," and he considers these deviations

12  "immaterial in nature and do not minimize the overall effectiveness of the compliance regime."

13  (*Id.*)  Amerine concludes that, "[i]n [his] opinion, the Rio developed an extensive program for

14  evaluating transactions for suspicious activity in conformity with industry norms[]" and Rio

15  acted "reasonably and within standard industry practices and norms in dealing with Mr. Favata's

16  activities at the casino during the period of May 18, 2004 and March 23, 2006.

17        In contrast to his report, Amerine's true opinions came to light at his deposition:

18  ■   Amerine admitted that the unspecified "industry standard and norms" he opines that
19      Rio complied with are written minimum internal control standards ("MICS") which
        Nevada gaming regulations require casinos to put in place (Wright Decl., Ex. B-64 at
20      71:23-72:14);

21  ■   In his 30 year career, Amerine has only seen two MICS used by casinos, one of which
        was for a "small, very small operation," and "since 1992 [he] has not had access to
22      the internal policies and procedures of the large Nevada casino" (*id.* at 61:22-63:7);

23  ■   Rio did not verify 12 of the 63 of the cashier's checks – totaling over $2,000,000 or
        20% of all monies that Favata presented to Rio before it allowed him to gamble with
24      the proceeds (*Id.* at 90:8-91:15);

25  ■   The Nevada gaming statutes, regulations and internal controls have to do with
        protecting casino's fiscal affairs, not monitoring Favata's activities for suspicious
        conduct (*Id.* at 78:21-80:3);

- Rio tracked Favata's gaming activities well – Pemberton kept a handwritten book just about Favata which disappeared after Pemberton left Rio in 2007, despite the fact that under Title 31, Rio had an obligation to keep such records for a minimum of 5 years, but did not (*Id.* at 122:4-123:3, 287:10-290:4);

- Amerine disagrees with Rio's assertion in interrogatories sworn to by Ortzman, Rio's Rule 30(b)(6) designee on its alleged compliance federal and state anti-money regulations. (*Id.* at 144:3-25 (Amerine believes that "it was effective until 2003");

- Rio had no written risk-based compliance program before 2005 (150), no training program and even David Darby, then-Rio's Compliance Officer, "certainly did not seem to understand what the changes [in 2002/2003] were and when they were in effect" (*Id.* at 150:10-23, 151:11-153:5, 158:13-162:22);

- Nor did Darby understand the requirements of Title 31 (*Id.* 170:21-171:0);

- Rio did not comply with the two principal requirements imposed by Title 31, suspicious activity reporting under 31 CFR § 103.64 (*Id.* at 70:13-71:9);

- Amerine did not know of any Rio witness who understood their obligations under Title 31 (*Id.* at 152:15-154:19);

- Ex. B-6 to Leahy's Expert Report, charting cash in and cash out between 2002 and 2004, would absolutely cause him to look at Favata's gaming activities and whether he is structuring (*Id.* at 282:13-283:22);

- Amerine opined in this case that there is no requirement for the casino to investigate source of funds ever (*Id.* at 308:10-309:17);

- In *Fischer v. Hilton*, where Amerine served as the expert for the Trustee seeking to recover fraudulent conveyances made to the Las Vegas Hilton, he opined that the Hitlon did have an obligation to investigate source of funds being transferred to the casino. (*Id.* Ex. B-10 at 8.)

### iii.        Ortzman

Orztman worked as a consultant for Harrah's, Rio's parent company, prior to 2004. (*Id.* B-52 at 19:12-20:3.) In late 2004, he joined Harrah's full-time as its Corporate Director of Enterprise Risk Management. (*Id.* 23:11-22.) Ortzman became the Regional Vice President of Finance for Rio between October 2005 and December 2009. (Ortzman Aff. at ¶ 2.) Beginning

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   in October 2005, Ortzman had primary responsibility over Rio's cage, with the cage reporting to

2   him. (Wright Decl. Ex. B-52 at 333:14-19.)

3       Rio designated Ortzman as its Rule 30(b)(6) witness regarding Rio's response to

4   government inquiries involving Favata and Rio's alleged compliance with anti-money laundering

5   statutes and regulations. (*Id.* B-52 at 6:23-7:17.)   In addition to asserting that Rio complied

6   with unnamed "policies and procedures" with respect to Mr. Favata, Ortzman also claims in

7   support of Rio's summary judgment motion that he "periodically monitored the gaming activity

8   of" Favata without saying what he did or when he purportedly did it. (Ortzman Aff. ¶ 3.)   Yet at

9   his deposition, Ortzman did not know if, prior to May 2006, anyone (presumably including

10  himself) at Rio performed any kind of "analysis or monitoring" of Favata's gaming patterns or

11  activity. (Wright Decl. Ex. B-52 at 151:8-19.)   The only monitoring he was aware of was

12  determining whether Favata's gaming activity warranted "comps." (*Id.* at 151:20-152:13.)

13  Otherwise, Ortzman has no knowledge of the following:

14  ■   Favata's activities at Rio before October 2005 (*Id.* B-52 at 24:15-21);

15  ■   what any of Rio's policies and procedures were prior to October 2005, including but
    not limited to processing and acceptance of cashier's checks or otherwise, much less

16      whether they were followed with respect to Favata (*Id.* B-59 at 74:24-75:4)

17  ■   that Favata repeatedly exceeded his credit card limit at Rio until management granted
        him a permanent exception (*Id.* Ex. B-52 at 114:8-115:2; *see* Mader Dec., Ex. B-40 at

18      NGC00049) ("*5/27/05 NOTE FOR ALL STAFF: PER WILSON[13] THIS GST'S
        [guest's] CHARGING PRVLIGES [sic] MUST REMAIN OPEN AND HIS CC

19      [credit card] IS NOT TO BE CHARGED **EVEN IF GST [guest] RUNS OUT OF
        CASH/CC [cashier's check] DEPOSIT DURING HIS TRIP.**[14]  THANK YOU

20      GVINORAY**") (emphasis added);

21

22  _____

23  [13] "Wilson" is Wilson Ning, Vinoray's boss. (*Id.* Ex. B-49 at 28:21-29:9.)  Rio's Manager of VIP
    Services, Dustin Brown, also approved.

24  [14] Vinoray's notation on Favata's account was never removed, at least not prior to his last visit to
    Rio in March 2006. Thus, Rio's claim, unsupported by any citation to evidence (Rio Fraud

25  Trans. Memo at 24:3-23), that Rio management's directive to allow to keep Favata's "charging
    privileges open" did not mean Rio was advancing Favata credit because there was always
    sufficient funds in his front money account to cover such charges is untrue because the directive

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

- that a SAR was filed in 2003 concerning an incident where Favata appeared to be avoiding reporting requirements (*Id.* Exs. B-52 at 137:15-23; B-69);

- whether Rio had any written procedures for processing and accepting cashier's checks from, either known or unknown customers (*Id.* Ex. B-52 at 98:20-99:3);

- Ortzman did not recognize Ex. 544, the only written procedure for accepting and processing cashier's checks produced by Rio in discovery (*Id.* Exs. B-52 at 98:11-99:3; B-43);

- whether Rio has to contact central credit when someone opens a front money account, even though such accounts were opened at the cage and the cage was Ortzman's responsibility (*Id.* Ex. B-52 at 31:16-24);

- how, whether or when Rio implemented any changes to its policies and procedures to conform with the federal anti-money laundering regulations Rio was supposed to implement by March 23, 2003 (*Id.* B-59 at 94:1-96:5.)

Ortzman did admit, however, that if he knew that a player had a low net worth, and was playing in amounts substantially exceeding it, it would raise suspicion – but that was not his understanding of Favata because Rio took Favata at his word.   (*Id.* Ex. B-52 at 122:10-123:2.)

### iv.       Greenbaum

Greenbaum has been with Harrah's Entertainment (now known as Caesar's Entertainment) since 1989. (Greenbaum Aff. ¶2.)  Between 2003 and 2005, Greenbaum's title was Vice President of Race Sports, Keno Operations for the Las Vegas region (*Id.* Ex. B-52 22:20-23:6.)  Greenbaum, like Ortzman, claims in support of Rio's summary judgment motions that, in the vaguest terms possible, "all of the Rio's [unspecified] policies and procedures were followed with respect to Mr. Favata[,] even though he was only "familiar, at a high level, with [his] playing activities." (Greenbaum Aff. ¶¶ 3-4.)   Greenbaum's Affidavit provides no further detail on either subject.

In stark contrast, at his deposition, Greenbaum's knowledge of Favata and his gaming activities was very specific, and with respect to Rio's bottomline number:

was to keep his charging privileges open even if he ran out of cash or funds in his front money account.  (Mader Decl., Ex. B-40 at NGC00049.)

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

- Favata came to Greenbaum's attention as a customer who was betting "big," meaning someone who exceeded or wanted to exceed betting limits (Wright Decl. Ex. B-50 at 30:4-31:14.)
- Greenbaum monitored big bettors to analyze the risk these big bettors brought to the casino. (*Id.*)
- Reviews of Favata's play were done but were "more or less informal, I think.. . . It was just a glance of a statement or a daily win/loss or knowing that your operating statement is either more or less that month because of one player." (*Id.* at 68:19-69:13);
- Favata had an impact on the operating statement for Rio's Sports Race and Book in a given month, [e]ither a plus or a minus on the statement because of his level of play[]" (*Id.* at 69:25-70:8);
- Greenbaum only looked at Favata's play "occasionally" "to see where his action was, at what level" (*Id.* at 71:7-18);
- Greenbaum's discussions with David Pemberton, the Manager of Rio's Race and Sports Book, and David Patent, Rio's Assistant General Manager, about Favata was limited to "where we were with Sal" and whether to increase his betting limits, which they generally did (*Id.* at 72:6-73:14, 100:5-101:14);
- Greenbaum had no understanding that money laundering could be perpetrated through cashier's checks (*Id.* at 36:22-37:19);
- At the time Favata was gambling at Rio, Greenbaum was trained under Reg. 6A's subjective standard for suspicious activity reporting instead of Title 31's governing legal standard.  The training he received was to go with his gut feeling.  If he was not comfortable with something, he was told he should report it (*Id.* at 47:2-18.)

v.      **Pemberton**

Between 2001 and 2007, Pemberton was the Manager of Rio's Race and Sports Book, where Favata did his gambling. (Pemberton Aff., ¶ 1.)   In 2007, Pemberton went to work as the Director of Specialty Games at Bally's Paris. (Wright Decl. Ex. B-48 at 18:25-19:5.)  During the period when Favata was gambling at Rio, Pemberton reported to Greenbaum. (*Id.* Ex. B-48 at 17:21-18:13.)   Pemberton, just like Ortzman and Greenbaum, declares in support of Rio's summary judgment motion on its good faith defense that "[t]he best of my knowledge, all of the Rio's policies and procedures were followed with respect to Mr. Favata." (Pemberton Aff. ¶ 4.)

1   And just like Ortzman and Greenbaum, Pemberton does not identify or describe a single policy

2   or procedure he believes were followed or who, at Rio, followed them.

3        While Pemberton claims in his moving affidavit that he "periodically" interacted with

4   Favata (Pemberton Aff. ¶3), his deposition testimony tells another story.  Pemberton and his

5   superiors kept a very close eye on Favata and his gaming activity to evaluate his frequent

6   requests to increase his betting limits, to see who was ahead of whom as between Favata and Rio

7   and generally protect Rio's bottom line. In fact, Greenbaum asked Pemberton to keep a book,

8   which he personally prepared, "that had [Favata's] bets," and only Favata's bets (the "Favata

9   Book"). (Wright Decl. Ex. B-48 at 14:24-15:25.)  He kept the Favata Book at Greenbaum's

10  request starting in 2005 because he was a player "we like to keep track of . . . to see if he's

11  winning or losing." (*Id.* at 17:12-18:1, 18:5-10.)  Pemberton also kept another handwritten book

12  he called the "tracking book," which contained similar information about the gaming history of

13  Favata and other big bettors.  Neither book was produced in discovery.  (*Id.* at 17:12-18:1, 65:23-

14  66:3.)

15        Favata asked to exceed his betting limits with such frequency that, after a while, instead

16  of setting betting limits for a particular event as Rio did with its other Seven Star players,

17  Greenbaum, Patent and Pemberton "established a limit so [Pemberton] would not have to call all

18  the time." (*Id.* at 64:3-9.)  Pemberton also testified that between 2002 and 2006, he regularly

19  discussed with Greenbaum and Rio Assistant General Manager David Patent fluctuations, both

20  positively and negatively, in the Rio Race and Sports Book revenue caused by Favata's play.

21  (*Id.* Ex. B-62 at 184:25-185:4, 188: 4-16.)  That is not surprising since Favata was the biggest

22  bettor Pemberton had at Rio.  (*Id.* at 263:21-24.)

23        Pemberton was also aware from Greenbaum, that Favata used cashier's checks to gamble

24  at Rio. (*Id.* B-48 at 102:12-25.)  NCM is identified as the funds  source for 6 of the 66 cashier's

25  checks Favata transferred to Rio (Thorddsen Decl. Ex. D-11 at 002723, 000678, 000107,

1    000122, 000091, 000081), but no one at Rio, including Pemberton, ever investigated or inquired

2    about Favata except when Rio thought there was a risk of financial loss to the casino.

3         Each of the affidavits also recite, verbatim, that they "never knew or suspected that he

4    was involved in any allegedly fraudulent activities with respect to his real estate ventures" or

5    "that NCM was allegedly insolvent or that it was a purported Ponzi scheme." (Pemberton Aff.

6    ¶ 6.)   As discussed below, a parties' subjective knowledge of the circumstances is irrelevant to

7    the question of both good faith and Rio's compliance with Title 31, as even its experts now admit

8    is controlling law.

9         **vi.**      **King**

10        The Affidavit of Teri King, sworn to on August 8, 2011, is significant for what it does not

11   contain – nowhere within the text of the affidavit is an assertion that the Rio followed all

12   applicable gaming regulations.  (King Aff.)  This omission is especially remarkable because Ms.

13   King was put forward as the Rio's 30(b)(6) witness regarding "opening and operating Favata's

14   front money account at the Rio and Rio's cashing or processing of the cashier's checks identified

15   in the complaint with respect to the cage department's procedures." (Wright Decl. Ex. B-51 at

16   214:18-24.)  However, at her deposition, certain documents were put before Ms. King that make

17   clear that the Rio was not following the applicable Federal Regulations in 2003, 2004, or 2005.

18   In November 2006, the Rio's internal control concerning currency transaction reporting, in

19   relevant part, stated:

20             On September 12, 2002, the U.S. Department of the Treasury issued a

21             final rule under the Bank Secrecy Act requiring all casinos within the
               United states [sic.] to file a Suspicious Activity Report By Casinos

22             (SARC) directly with FinCEN on all transactions aggregating to $5,000 or
               more in funds or other assets when the casino "knows, suspects or has

23             reason to suspect" that the transactions is [sic.] of a suspicious nature.  The
               rule was required to be implemented by March 23, 2003.  At that time, the

24             Gaming Control Board was no longer responsible for monitoring
               compliance with the reporting procedures of this regulation....

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   (*Id.* Ex. B-27 at 8.)  Despite the Rio's acknowledgement that this Federal regulation needed to

2   be implemented by March 23, 2003, the Rio's instructions to its employees in 2003 and 2005

3   fully ignored Federal regulations, and instead mentioned only Nevada Gaming Control Board

4   Regulation 6A (*Id.* Exs. B-8 at 13; B-20 at IPD 01336) – which critically differs from the Federal

5   regulation in that Regulation 6A is subjective, and the Federal rule is objective.

6   **2.   Rio Never Questioned The Source the Funds Favata Gambled Despite**
      **Circumstances That A "Reasonable Casino" Would Regard as Suspicious**

7

8   Over the course of his 73 visits to Rio in nearly three years, Favata gambled with

9   cashier's checks that he, or others on his behalf, endorsed over to Rio.  The 66 cashier's checks

10  ranged in amount from $15,000 to $350,000, totaling $10,342,008.21, and 8 of them, on their

11  face, identified NCM or others (including Favata's mother Dorothy) as the source of the funds.

12  (Thoroddsen Decl. Ex. D-11 at 002723, 000678, 000107, 000122, 000091, 000081, 00135,

13  000160, 000111.)  In fact, the very first cashier's check Favata transferred to Rio on August 29,

14  2003 for $48,000 indicated that NCM was the purchaser of the check, which was made payable

15  to Favata.  (*Id.* at 002733)  Rio deposited each of those checks into its own general operating

16  account.  (*Id.*)  Over nearly three years of gambling at Rio, Favata transferred a total of 6

17  cashier's checks totaling $623,000 to Rio that indicated NCM was the purchaser.

18  Rio concedes that it never inquired about the source of funds that Favata was gambling at

19  the casino. (Rio Good Faith Memo at 15:1-2; Wright Decl. Ex. B-28 at Response 1.)  According

20  to Rio, it never had reason to question where Favata was getting hundreds of thousands of dollars

21  in cashier's checks, even though his credit cards "would shut down all the time" when his room

22  and incidental charges exceeded the low four figure limit on his subprime credit card.  (*Id.* Ex. B-

23  49 228:15-229:4.)  Rio management and casino personnel who interacted with him on a regular

24  basis also believed he was an "owner" of NCM, and took Favata at his word when he told them

25  NCM netted $300,000 per month and closed $35 million in loans in a month.   (*Id.* B-62 at

263:7-20.) Yet Rio's own files reveal that Favata identified three different employers – A Small

1  World Day Care (formerly owned by Dorothy, Favata's mother, and bankrupted long before he

2  started gambling at Rio), "Owner" of NCM and a "VP" of nothing – along with Sandra, the

3  secondary account name on Favata's front money account. (*Id.* Exs. B-42; B-9.)

4      Rio admittedly verified only two things before accepting the Fraudulent Transfers,

5  depositing them in its general operating account and allowing Favata to gamble with them. First,

6  Rio verified whether the issuing bank actually issued the checks. (*Id.* Ex. B-53 at 61:14-23.)

7  Second, Rio confirmed whether there were any holds or stops on them to ensure no risk of loss to

8  the casino. (*Id.* at 59:4-15; Ex. B-28 at Response 6.) Even then, Rio allowed Favata to gamble

9  before it was able to "verify" at least 20% of the cashier's checks, totaling over $2,000,000. (*Id.*

10  Ex. B-33 at 6.)

11      In Favata's case, usually days in advance of his trips to Rio he frequently transmitted via

12  facsimile copies of the cashier's checks to Germaine Vinoray, his assigned casino host at Rio.

13  (*Id.* Ex. B-49 at 24:8-24; Ex. B-29) Vinoray then asked Rio's credit department to "verify" the

14  cashier's checks by calling the issuing bank. (*Id.* Ex. 53 at 61:14-23) In at least 12 instances,

15  however, as Rio and Amerine concede, Rio allowed Favata to gamble with cashier's checks,

16  totaling over $2,009,000 or 20% of the total amount of cashier's checks he presented to Rio

17  between August 2003 and March 2006, before Rio verified them with the issuing banks. (*Id.* Ex

18  B-33 at 6.) According to Amerine, Rio's failure to abide by its own "policies and procedures"

19  for accepting cashier's checks amounting to 20% of the total amount of checks Favata gambled

20  is not "material" because, in hindsight, the unverified checks cleared after the fact. (*Id.*)

21      As time went on, Favata's gambling pattern grew more and more erratic. His erratic

22  gambling in 2004 and 2005 alone noticed the RIO as to the potential voidability of the transfers.

23  (*Id.* Exs. B-40; B-68.) Favata was one of the RIO's largest customers. (*Id.* B-52 at p. 27:4-12.)

24  Between 2002 and early 2006 when he finally turned himself in, Favata lost at the RIO: $7,855

25  in 2002; $21,491 in 2003; $181,469 in 2004; $6,590,879 in 2005 and $1,109,991 in the first

1    quarter of 2006. (*Id.* Ex. 40.) Favata lost about thirty-six (36) times more money in 2005 at the

2    RIO than he did the prior year, and his 2005 losses were three hundred and six (306) times

3    greater than his 2003 losses. (*Id.*) Moreover, Favata's gambling patterns were, according to the

4    Rio's own witness, unreasonable, with Favata recklessly running up gambling losses without

5    care. (*Id.* Ex. B-41; Ex. B-56 8:16-25.)

6          Yet Favata could not even cover his room and meal expenses, absent the RIO granting

7    him special charging privileges and "comping" him the expenses at the end of the stay, with the

8    credit cards issued in his name, all of which had miniscule credit limits. (*See* Mader Dec., Ex.

9    B-40 at NGC00049 ; *Id.* Exs. B-49 at 227:7-238:5; B-17; B-72.) Moreover, National Consumer

10   Mortgage was identified as the purchaser on 6 of the cashier checks further raising questions

11   about the source of funds presented by Favata to RIO. (Thoroddsen Decl. Exhibit D-11 at

12   002723, 000678, 000107, 000122, 000091, 000081.)

13         **3.     Rio Never Investigates Favata Despite Knowledge of Facts That Would
                    Cause a Reasonable Person to Investigate Further**

14

15         David Darby ("Darby"), Rio's Compliance Officer between September 2003 and October

16   2005, admitted quite candidly that if he had known that Favata had very low credit limits and

17   was gambling with millions of dollars of cashier's checks, some purchased by his mortgage

18   company, these circumstances alone would warrant further investigation, which Rio never did.

19   That is because, as Darby also admitted, during his tenure as compliance officer, Rio failed to

20   comply with governing federal regulations under the Bank Secrecy Act ("BSA") and USA

21   PATRIOT Act that required Rio to develop and implement a risk-based, written anti-money

22   laundering ("AML") compliance program by March 23, 2003, six months before Favata started

23   presenting the fraudulent transfers to Rio.

24         Under federal law and regulations, as of March 23, 2003, the Rio was required to:

25   ■   Maintain a system of internal controls reasonably designed to prevent money
         laundering and assure compliance with the BSA.

- ■ Engage in internal or external testing for compliance with the scope and frequency commensurate with the risks of money laundering and terrorist financing and products and services provided.

- ■ Train casino personnel in conformity with the AML program and applicable federal regulations.

- ■ Designate an individual or individuals responsible for day-to-day compliance with the BSA and the AML program.

- ■ Have procedures for using all available information to determine name, address, social security number and other information and verification of a person when required, and to determine the occurrence of any transaction or pattern of transactions required to be reported as suspicious.

- ■ For casinos, like Rio, that have computer systems, automate programs to aggregate all available information to aid in assuring compliance.

(Wright Decl. Ex. B-51 at 188:24-191:7.)

## G.    NCM Files for Bankruptcy

NCM filed for bankruptcy on April 3, 2006, by filing a voluntary Chapter 11 petition executed by Sandra. (Wright Decl. Ex. B-22.)  The United States Trustee moved to appoint John Brincko as Chapter 11 Trustee, which was approved by Order of the Bankruptcy Court, dated May 12, 2006. (Brincko Decl. Ex. C-1.)  By Order dated June 23, 2006, the Trustee was authorized to retain the Brincko Group to assist the Trustee with his duties and evaluate NCM's financial condition.  (*Id.* Ex. C-2; Thorrodsen Decl. at ¶ 5.)

At the initial meeting between the Trustee and the Debtor's then bankruptcy professionals on May 15, 2006, the Trustee was advised that the Debtor's financial records were disorderly and incomplete with extremely limited books and records, none of which were prepared in accordance with generally accepted accounting principles.  (Wright Decl. Ex. B-1 at ¶ 5; Thorrodsen Decl. at ¶¶ 6-7.)  The Trustee, through the work of the Brincko Group under his supervision, began to reconstruct the books and records of the Debtor, initially relying upon the limited financial records maintained by the Debtor and the Debtor's accountant. (*Id.* at ¶¶ 11-12.) The Brincko Group's initial review of the Debtor's financial records confirmed that they were

1  largely inaccurate and fraudulent. (*Id.* at ¶¶ 13-16.)  Because the Debtor's financial records were

2  so incomplete, the Trustee issued Rule 2004 subpoenas to all of the Debtor's financial

3  institutions. (*Id.* at ¶17, Exs. D-3, D-4, D-5.)  Using those bank records and the limited records

4  maintained by the Debtor, the Trustee was able to reconstruct a general ledger reflecting NCM's

5  financial activity for the years 2001 through 2006. (*Id.* at ¶¶17-18, Ex.  D-6.)

6  **APPLICABLE LEGAL STANDARDS**

7  A motion for summary judgment must be granted when "the pleadings, depositions,

8  answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

9  there is no genuine issue as to any material fact and that the moving party is entitled to a

10  judgment as a matter of law." FED. R. CIV. P. 56(c).  "Where the moving party will have the

11  burden of proof on an issue at trial, the movant must affirmatively demonstrate that no

12  reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless,*

13  *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  However on an issue where the nonmoving party has the

14  burden of proof, such as the Rio's good faith defense here, "the movant can prevail merely by

15  pointing out that there is an absence of evidence to support the nonmoving party's case. *Id.*  "If

16  the party moving for summary judgment meets its initial burden of identifying for the court the

17  portions of the materials on file that it believes demonstrate the absence of any genuine issue of

18  material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order

19  to preclude summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

20  626, 630 (9th Cir. 1987) (citations omitted).

21  Conclusory and speculative testimony in affidavits and moving papers are insufficient to

22  raise genuine issues of fact and to defeat summary judgment. *See Nelson v. Pima Cmty. Coll.,* 83

23  F.3d 1075, 1081-82 (9th Cir.1996) ("mere allegation and speculation do not create a factual

24  dispute for purposes of summary judgment"); *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d

25  730, 738 (9th Cir.1979).  "Instead, the nonmoving party must set forth, by affidavit or as

1    otherwise provided in Rule 56, "*specific facts* showing that there is a genuine issue for trial."[15]

2    *T.W. Elec. Serv*, 809 F.2d at 630, *citing* FED. R. CIV. P. 56(e) (emphasis in original).

3                                    **ARGUMENT**

4    **I.    SUMMARY JUDGMENT IN FAVOR OF THE TRUSTEE ON HIS
         FRAUDULENT CONVEYANCE CLAIMS IS WARRANTED**

5

6         **A.    The Transfers Were Made to Rio With Actually Fraudulent Intent to
                 Hinder, Delay or Defraud NCM's Creditors**

7         The Trustee may avoid transfers where the debtor, voluntarily or involuntarily "made

8    such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity

9    to which the debtor was or became, on or after the date that such transfer was made or such

10   obligation was incurred, indebted...." 11 U.S.C. § 548(a)(1)(A). In order to establish fraudulent

11   transfers consistent with Section 548(a)(1)(A), the Trustee must establish that the debtor had

12   fraudulent intent, and that the actions of Sam Favata are imputed to the debtor. The Trustee's

13   claim for "actual intend to hinder, delay or defraud any creditor of the debtor" under California's

14   Uniform Fraudulent Transfer Act, Cal. Civ. Code § 3439.04(a)(1) is substantively identical.[16]

15

16        **1.    Evidence of Sam Favata's Ponzi Scheme is Proof of Fraudulent Intent**

17

18

19

20   _____

21   [15] To the extent that the Court makes a determination that Rio's moving affidavits are clearly and
     unambiguously inconsistent with their prior testimony, that portion of the Affidavits that are
22   inconsistent may be stricken under the "sham affidavit" rule, because "if a party who has been
     examined at length on deposition could raise an issue of fact simply by submitting an affidavit
23   contradicting his own prior testimony, this would greatly diminish the utility of summary
     judgment as a procedure for screening out sham issues of fact." *Foster v. Arcata Assocs., Inc.*,
24   772 F.2d 1453, 1462 (9th Cir. 1985) (quoting *Radobenko v. Automated Equipment Corp.*, 520
     F.2d 540, 544 (9th Cir. 1975)).
25   [16] The only difference between the federal and CUFTA claims is CUFTA has a three year statute
     of limitations, compared to 11 U.S.C. §548(a)(1)(A), which allows the Trustee to recover
     transfers up to one year before the petition filing date.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    First, Sam Favata admitted, in both his plea agreement and his deposition that he engaged

2  in a Ponzi scheme.[17]  Proof of a Ponzi scheme is by itself enough to "fulfill the requirement of

3  actual intent on the part of the debtor." *In re Slatkin*, 310 B.R.740, 748 (C.D. Cal. 2004)

4  ("*Slatkin I*") (quoting *Hayes v. Palm Seedling Partners*, 916 F.2d 528, 536 (9th Cir. 1990)).

5    Further, the law in the Ninth Circuit, as cited by the Rio in its own brief, unequivocally

6  supports the Trustee's position that Favata's plea agreement is conclusive proof of fraudulent

7  intent.[18]  See *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (the operator had

8

9  [17] Favata's plea agreement contains a "direct admission by the debtor that he operated a Ponzi

10  scheme with the intent to defraud", notwithstanding Rio's protestations to the contrary.  (Rio
Aff. Claims Fraud. Transfer Memo. p. 17.)  The Rio further claims that *In re Slatkin*, 525 F.3d

11  805 (9th Cir. 2008) ("*Slatkin II*") does not apply because the plea agreement in this action
purportedly "does not contain a … probative admission by [Favata] of a Ponzi scheme." (*Id.*)

12  The Trustee relies on *Slatkin I*, not *Slatkin, II*.  Second, and as explained in detail above, *supra*,
II. D. 1, Favata absolutely admitted to running a Ponzi scheme in his plea agreement (Wright

13  Decl., Ex. B-25 2:6-6:3 (emphasis added).)  Moreover, contrary to the Rio's assertions, *Slatkin II*
contains no requirement that the words "Ponzi scheme" appear in a plea agreement to be

14  considered as Ponzi scheme admission.  In fact, the plea agreement in *Slatkin I* reads remarkably
like the plea agreement Favata signed – both clearly discuss the use of diverted funds from later

15  investors to pay back earlier investors, and neither uses the term "Ponzi scheme" anywhere
therein.  *Compare* Wright Decl. Ex. B-25 *with Slatkin I*, 310 B.R. at 749.

16
[18] Rio claims that Favata's plea agreement is somehow insufficient to rise to an admission of a

17  Ponzi scheme.  Rio's own cases do not support its claim.  *In re Lake States Commodities, Inc.*,
271 B.R. 575, 584 (Bankr. N.D. Ill. 2002) merely points out that a Trustee may establish the

18  existence of a Ponzi scheme by proving the four elements Rio quotes from the case as an
**alternative** to a plea agreement admitting the factual predicate for a Ponzi scheme.  While in this

19  case, there is ample independent evidence with respect to Favata establishing the four elements
identified in *In re Lake States*, it is unnecessary because his plea agreement clearly establishes

20  the Ponzi scheme.  Similarly, *In re Lull*, 386 B.R. 261, 269-70 (Bankr. D. Haw. 2008) is
inapposite because there, the only available evidence of a Ponzi scheme was testimony from the

21  alleged Ponzi schemer that he stopped using investor money for bridge loans and started using
the money to pay project costs and other things including debt servicing and other clients.  Here,

22  Favata's plea agreement provides more detail  in line with the requirements delineated in *Slatkin*
*I* and *Slatkin II*.  Rio's reliance on *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1137-38 (D. Ariz.

23  2006) is also misplaced.  First, in *Warfield*, the court expressly found that the plea agreement
admissions rose to the level of those in *Slatkin I*, and therefore constituted proof of a Ponzi

24  scheme sufficient to establish actual intent.  Second, the only outstanding issue in *Warfield* was
whether a group of defendants had a good faith defense to the Trustee's fraudulent transfer

25  claim.  Id. at 1138.  Whether Rio has a good faith defense is irrelevant to whether NCM had
actual intent to defraud.

1  admitted in his guilty plea for mail and wire fraud to running a Ponzi scheme, thus satisfying the

2  actual intent requirement, just like Favata did here when he pled guilty to mail fraud here); *see*

3  *also Slatkin II*, 525 F.3d 805, 814 (9th Cir. 2008) (operator of Ponzi scheme admitted the

4  mechanics of his scheme in a plea agreement for mail fraud, like the instant action); *In re United*

5  *Development*, 319 Fed. Appx. 685, 687 (9th Cir. 2009) (finding that admission that the company

6  "made payments to lenders from money obtained from later lenders, rather than from business

7  profits" considered sufficient to infer a Ponzi scheme for avoidance purposes).

8           **2.     Even Absent a Ponzi Scheme, the Trustee Can Establish Fraudulent**
           **Intent**
9

10          Even if, arguendo, the Trustee did not have conclusive evidence of a Ponzi scheme, the

11  Trustee would still be able to succeed in his claim because fraudulent intent can also be inferred

12  by showing badges of fraud.[19] *See In re Acequia, Inc.*, 34 F.3d 800, 805-06 (9th Cir. 1994).

13  Those badges of fraud, which do not all need to be present and are not limited to the following,

14  include: "1) a close relationship between the transferor and the transferee; 2) [] the transfer was

15  in anticipation of a pending suit; 3) [] the transferor Debtor was insolvent or in poor financial

16  condition at the time; 4) [] all or substantially all of the Debtor's property was transferred; 5) []

17  the transfer so completely depleted the Debtor's assets that the creditor has been hindered or

18  delayed in recovering any part of the judgment; and 6) [] the Debtor received inadequate

19  consideration for the transfer." *In re Woodfield*, 978 F.2d 516, 518 (9th Cir. 1992).

20          Several badges of fraud are particularly relevant to the present circumstances.  Here,

21  there is no dispute that there is a close relationship between Favata and NCM (he ran all of the

22  finances after all), as well as the familial relationship between Favata and NCM's two owners,

23  Sandra and his mother, Dorothy.  As discussed above, there can be no legitimate dispute, based

24
   ――――――――――――――――
25  [19] A non-exhaustive list of eleven common "badges of fraud" are codified in California as
   Section 3439.04 of the Uniform Fraudulent Transfer Act ("CUFTA"), under which Counts 3 and
   4 of the Trustee's First Amended Complaint are brought. West's Ann.Cal.Civ.Code §
   3439.04(b).

1   on the Thoroddsen Declaration and accompanying exhibits, that NCM was insolvent at the time

2   of each transfer.  Thoroddsen Decl. ¶ 30, Ex. D-12.

### 3.   Favata's Fraudulent Intent May Be Imputed to NCM

4        Section 2295 of the California Civil Code defines an agent as "one who represents

5   another, called the principal, in dealings with third persons."  Where a bad act has been

6   committed by an agent, "fraud may be imputed under general agency principles" to the principal

7   in whose scope of authority the agent has been acting, and such action by the agent binds the

8   principal.  *In re Tran*, 301 B.R. 576, 581 (Bankr. S.D. Cal. 2003).  In the present circumstances,

9   while there is an ample factual record to establish that Favata had actual authority to act on

10  NCM's behalf and bind it, even assuming arguendo he did not have actual authority, it is

11  undisputable that Favata had ostensible authority under California law.

12       Section 2317 of the California Civil Code defines "ostensible authority" as "such as a

13  principal, intentionally or by want of ordinary care, causes or allows a third person to believe the

14  agent to possess."  An agent, such as Favata, that acts within his "apparent or ostensible authority

15  binds the principal where the principal has intentionally or negligently allowed others to believe

16  the agent has authority." *Brave New Films 501(c)(4) v. Weiner*, 626 F. Supp. 2d 1013, 1016

17  (N.D. Cal. 2009) (*quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213

18  F.3d 474, 479 (9th Cir. 2000)).  The principal's consent need not express – "ostensible authority

19  may be proven through evidence of the principal transaction solely through the agent, the

20  principal knowing that the agent holds himself out as clothed with certain authority but

21  remaining silent, [or] the principal's representations to the public in general...." *C.A.R. Transp.*

22  *Brokerage Co., Inc.*, 213 F.3d at 480.

23       *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R.704, 710 (S.D.N.Y. 2001) is strikingly

24  similar to the case at bar.  In *Breenden*, four family members were the relevant decision makers

25  at the debtor company and a Ponzi scheme was perpetrated, but only two of the four family

1   members were shareholders of the debtor company.  The court in *Breeden* nonetheless found that

2   even though the two shareholders were not actively involved in the Ponzi scheme, the acts of a

3   third family member were imputed to the debtor because the two shareholders "delegated

4   unfettered control of BFG's financial operations" to the Ponzi scheme perpetrator.  Id.  *Breeden*

5   has been cited favorably by this Court for the proposition that a sole actor rule should apply

6   "where the corporation delegates all authority over a portion of its business to a particular

7   manager or managers."  *USCAM Liquidated Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d

8   1210, 1220 (D. Nev. 2011) (Pro, J.) (quoting *Breeden*, 268 B.R. at 709-10).

9        In the present case, the two shareholders of NCM, Sandra and Dorothy, at a minimum,

10  gave sworn statements affirming that Favata had authority to bind NCM because he had

11  unfettered control and authority over NCM's finances as its *de facto* "CFO/Controller," despite

12  his prior felony conviction. Admittedly, Sandra put Favata in charge of NCM's finances and

13  profitability.  Admittedly, Sandra and Dorothy permitted Favata to obtain hundreds of signed

14  blank checks drawn on NCM's account.  Admittedly, Sandra accompanied Favata to meet with

15  potential investors to discuss the terms of the investments, Sandra made representations about the

16  investments and the disclosures NCM supposedly made to potential investors, Sandra prepared

17  the Investment Contracts, and Sandra signed them, individually and on behalf of NCM.

### 4.   Favata Transfers NCM's Funds to Rio

19       Rio tries, albeit baselessly, to parse Favata's transfer of the illicit proceeds of the Ponzi

20  scheme to Rio into four discrete transactions.  (Rio Good Faith Memo at 6:2-6.)  By doing so,

21  Rio unwittingly acknowledges the steps Favata used to conceal the source of the funds that both

22  federal and state anti-money laundering regulations were implemented to detect.[20]  Under

---

[20] Five of the cashier's checks, totaling $623,000, identified NCM as the purchaser of the cashier's checks and therefore, the source of funds.  Three other cashier's checks, totaling $229,000, identified his mother Dorothy and two of his employees, the latter two of which often placed bets for him, as purchaser.  (Thoroddesn Decl., Ex. D-11.)

applicable law, Rio's characterization of the transfers does not mean, as Rio suggests, that Favata was transferring his own money to Rio as opposed to NCM's property.  Rio wrongly portrays Favata's diversions from NCM of funds stolen from investors as Favata's simply because he is the named payee all of the 66 cashier's checks transferred to Rio.  Rather, the four discrete steps only underscore the point of the federal anti-money laundering regulatory scheme that Rio failed to implement six months before Favata started transferring the funds at issue here to Rio – to detect and deter the use of the proceeds of illegal activity to gamble at casinos.  Accordingly, the Trustee respectfully requests that summary judgment be granted in his favor actual fraudulent transfer, pursuant to 11 U.S.C. § 548(a)(1)(A), in the amount of $8,135,000, and alternatively, under the California Uniform Fraudulent Transfers Act ("CUFTA"), in the amount of $10,342,008.

### B.    The Trustee Has Established that Summary Judgment Is Also Warranted on the Constructive Fraud Claims

Under Section 548(a)(1)(B), transfers are avoidable within two years if the Trustee can show constructive fraud by establishing that the **debtor**:

(i)    received less than a reasonably equivalent value in exchange for such transfer or obligation; **and**

(ii)

   (I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

   (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

   (III)    intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; **or**

   (IV)    made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

1   11 U.S.C. §548(a)(1)(B)(i)-(ii) (emphases added).  Therefore, in order for the Trustee to have

2   summary judgment on his (a)(1)(B) claim, all he has to establish is that NCM received less than

3   a reasonably equivalent value in exchange for the transfers to Favata, and one of the four

4   characteristics enumerated in subsection (ii) of the statute.

5       A transfer is fraudulent under CUFTA, if the debtor does not receive reasonably

6   equivalent value in exchange for the transfer or obligation, and "[w]as engaged or was about to

7   engage in a business or a transaction for which the remaining assets of the debtor were

8   unreasonably small in relation to the business or transaction," "intended to incur, or believed or

9   reasonably should have believed that he or she would incur, debts beyond his or her ability to

10  pay as they became due," or  "made the transfer or incurred the obligation without receiving a

11  reasonably equivalent value in exchange for the transfer or obligation and the debtor was

12  insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

13  CUFTA, §§ 3439.04(a)(2)(A-B) & 3439.05.  Insolvency is established under CUFTA if "at fair

14  valuations, the sum of the debtor's debts is greater than all of the debtor's assets." CUFTA §

15  3439.02(a).  Further, although under CUFTA, "as a general rule solvency and not insolvency is

16  presumed," *In re Mendez*, Adv. No. 06-1111, 2008 WL 597280, at *11 (E.D.Cal. Feb. 29, 2008),

17  by statute "a debtor who is generally not paying his or her debts as they become due is presumed

18  to be insolvent."  CUFTA, § 3439.02(c).

19

20

21

22

23              a.      **There Is Irrefutable Evidence Of Insolvency**

24                  i.          **The Favata Plea Agreement**

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

To begin with, and as explained above in Section 1, infra, the Trustee has submitted admissible and irrefutable proof of a Ponzi Scheme, which means that the Trustee has already met his burden of proving insolvency. "By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one." *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 871 (D. Utah 1987); *see also Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (*as cited in In re Maui Industrial Loan & Fin. Co.*, Adv. No. 11-90032, 2011 WL 260670, at * 3 (Bankr. D. Haw. Jun. 29, 2011) ("transfers made pursuant to a Ponzi scheme generally establish that the operator was insolvent")).

ii.     **The Trustee Has Additional Admissible Evidence Establishing Insolvency**

Even assuming, *arguendo*, that the Trustee was not able to show insolvency through its evidence of a Ponzi scheme, the Trustee has still made a prima facie case of insolvency through the declaration of Thora Thoroddsen and the Reconstruction. Under the Bankruptcy Code, insolvency exists at any time when the assets of the debtor are not greater than the liabilities. *See In re Lewis*, 401 B.R. 431, 437 (Bankr. C.D. Ca. 2009). The burden of making out a prima facie case of insolvency falls to the Trustee, which merely requires the Trustee to demonstrate that it is more likely than not that the debtor was insolvent when each transfer was made. *See In re Craftmart, Inc.*, C-93-4174-DLJ, 1994 WL 118274, at *2 (N.D. Ca. Mar. 10, 1994).

The Trustee has submitted a summary document (the "Reconstruction"), admissible under Federal Rule 1006, that fully demonstrates the insolvency of NCM at the time of each transfer.[21] As explained in detail in the declaration of Thora Thoroddsen, admissible under

---

[21] While the RIO attempts to argue that the Trustee's reconstruction is inadmissible, the cases they cite in support of that proposition are easily distinguished, because all of the RIO's cases assume that the reconstruction is an expert report under Federal Rule 702, which it is not. *See In re American Way Service Corp.*, 229 B.R. 496, 507 n.25 (Bankr. S.D. Fl. 1999), *Kipperman v. Onex Corp.*, 411 B.R.805, 839 (Bankr. N.D. Ga. 2009), *Wing v. Kaye Scholer, LLP*, No. 2:09-CV-371, 2010 WL 5020576, at *3 (Dec. 3, 2010). Further, because the Trustee does not seek admission of the Thoroddsen Declaration under FRE 702, the cases cited by the RIO with respect

BAILEY❖KENNEDY
1984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   Federal Rule 701, the Reconstruction shows that the Debtor was "insolvent at all times after

2   September 2003," the time when Sal Favata began diverting funds from the Debtor by means of

3   obtaining cashier's checks then conveyed to the RIO.  (Thorroddsen Decl., ¶ 29, Ex. D-12.)  As a

4   result, under the "balance sheet test," whereby insolvency is shown for each date if the liabilities

5   on the Debtor's balance sheet are greater than the assets, the Trustee has established that the

6   Debtor was insolvent at the time of each individual transfer at issue in this action.[22]  *See In re*

7   *Lewis*, 401 B.R. at 437 (explaining that under the balance sheet test, if liabilities are greater than

8   assets, the debtor is insolvent).

## 2.     The Reconstruction is Admissible under FRE 1006

10      The Reconstruction is admissible evidence under Rule 1006 which provides:

> The contents of voluminous writings, recordings, or photographs which cannot
> conveniently be examined in court may be presented in the form of a chart, summary, or
> calculation. The originals, or duplicates, shall be made available for examination or
> copying, or both, by other parties at reasonable time and place. The court may order that
> they be produced in court.

Fed. R. Evid. 1006.  A proponent of a summary exhibit must establish that (1) the records

underlying the summary are admissible; and (2) those records were made available to the

opposing party.  *U.S. v. Johnson*, 594 F.2d 1253, 1254-57 (9th Cir. 1979), *cert. denied*, 444 U.S.

964 (1979); *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 & n.8 (9th Cir. 1984) (Rule

1006 summaries used where producing the underlying documents would be impractical).  The

Reconstruction is predicated on voluminous financial records, haphazardly maintained over a

period of five years.  *See* Wright Dec., ¶¶3-6; *id.,* Ex. B-1; Thorroddsen Decl., ¶¶ 11-19; *see*

to the admissibility of expert testimony under FRE 702 are all inapposite.  *See In re Imperial
Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1013 (C.D. Ca. 2003), *In re Canvas Specialty,
Inc.*, 261 B.R. 12 (Bankr. C.D. Ca. 2001), *In re Lake States Commodities Inc.*, 271 B.R. 575
(Bankr. N.D. Ill. 2002).

[22] Because the balance sheet test applies, here, RIO's case *Credit Managers Ass'n v. Federal
Co.*, 629 F. Supp. 175, 184 (C.D. Ca. 1985), in which projections were being used instead of a
reconstructed balance sheet, is not relevant to the present action.

1   *S.E.C. v. Amazon Natural Treasures, Inc.*, 132 Fed. Appx. 701, 703 (9th Cir. 2005) (holding that

2   FED. R. EVID. 1006 applies to voluminous financial records); *Goldberg v. U.S.*, 789 F.2d 1341,

3   1343 (9th Cir. 1986) (upholding the lower court's admission of lay testimony concerning

4   summaries of voluminous tax records under Rule 1006); *Keith v. Volpe*, 618 F. Supp. 1132, 1161

5   (C.D. Cal. 1985) (holding that a summary and chart pertaining to 253 completed questionnaires

6   admissible under Rule 1006 because without the summary the court could not conveniently

7   examine the results).

8          All of the records relied upon in the Reconstruction and the Reconstruction itself have

9   been provided to the Rio through the discovery process. *See* Wright Dec. ¶ 3; *In re Real Estate*

10  *Assoc. Ltd. Partnership Litig.*, No. CV 98-7035, 2002 WL 31027557, at *2 (C.D. Cal. Aug. 29,

11  2002) (charts compiling information provided to defendants during discovery were permissible

12  under Rule 1006).  Finally, the records underlying the Reconstruction are admissible documents.

13  *See* Wright Dec. ¶¶3; Declaration of Declaration of Thora Thoroddsen, dated September 16,

14  2011, ¶¶ 11-18; *see also In re Oracle Corp. Sec. Litig.*, No. C. 01-00988, 2009 WL 1709050, at

15  *6 n.7 (N.D. Cal. June 19, 2009) (holding that the declarations accompanying motions for

16  summary judgment established a sufficient foundation that the summaries were admissible under

17  Rule 1006).  Thus, the Reconstruction is admissible under Rule 1006.  *Thomas v. Baca*, 514 F.

18  Supp. 2d 1201, 1210 (C.D. Cal. 2007) (in a motion for summary judgment or in the alternative,

19  summary adjudication, summaries are admissible under Rule 1006 where the underlying records

20  are voluminous, admissible under the hearsay exceptions, and were made available to opposing

21  counsel).

22

23

24          **3.       The Thoroddsen Declaration is Admissible as Opinion Testimony**
                        **under FRE 701**

25

1    Under Federal Rule of Evidence 701, lay opinion testimony is admissible where the

2    witness is rationally based on personal knowledge of the information testified about, and such

3    opinion is "helpful to a clear understanding … of a fact in issue." FRE 701, *see also Asplundh*

4    *Mfg. Div. v. Benton Harbor Engineering*, 57 F.3d 1190, 1198 (3d Cir. 1995) (personal

5    knowledge of balance sheets of debtor sufficient to qualify accountant "to testify to his opinion

6    on how lost profits could be calculated and to inferences that he could draw from his perception

7    of [debtor's] books"); *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126,

8    (M.D. Fl. 2007) (forensic computer examiner permitted to testify under Rule 701 as to "what he

9    ascertained from [company's] computers when initially engaged to examine them").

10    Here, the Thoroddsen Declaration lays out from Ms. Thoroddsen's personal knowledge

11    her understanding of how the summary Reconstruction was put together, and explains those

12    summaries.  Such testimony is clearly permissible as lay opinion testimony under FRE 701. *See,*

13    *e.g. Goldberg v. U.S.*, 789 F.2d 1341, 1343 (9th Cir. 1986) (permitting IRS agent to testify under

14    FRE 701 regarding the summaries of voluminous tax records prepared pursuant to FRE 1006);

15    *Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*, 345 Fed. Appx. 244, 247 (9th

16    Cir. 2009) (permitting lay witness to testify about a chart she prepared that summarized business

17    records pursuant to FRE 1006); *U.S. v. Frantz-Waiver*, No. CR 02-01267(A)-MMM, 2004 WL

18    5642909, at * 1 (C.D. Ca. Apr. 23, 2004) (permitting IRS agents to testify regarding what they

19    observed and determined during their audit under FRE 701).

20    **4.    CUFTA**

21    CUFTA shares with the Federal bankruptcy code the presumption that a Ponzi scheme

22    renders the Debtor insolvent. *See Donell v. Kowell*, 533 F.3d 762, 770-71 (9th Cir. 2008)

23    ("Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the

24    scheme operator '[w]as engaged or was about to engage in a business or a transaction for which

25    the remaining assets of the debtor were unreasonably small in relation to the business or

1   transaction,' § 3439.04(a)(2)(A), or '[i]ntended to incur, or believed or reasonably should have

2   believed that he or she would incur, debts beyond his or her ability to pay as they became due,' §

3   3439.04(a)(2)(B)").   Further, even if the Court did not find that a Ponzi scheme occurred, the

4   Trustee is still able to demonstrate that the Debtor was insolvent on the date of each relevant

5   transfer by use of the balance sheet test, and therefore relief under CUFTA is appropriate.  *See In*

6   *re Bay Plastics, Inc.*, 187 B.R. 315, 330 (Bankr. C.D. Cal. 1995) (finding that CUFTA "adopt[s]

7   the balance sheet test for insolvency: a debtor is insolvent if the liabilities exceed the assets").

8   However, while CUFTA parallels Section 548(a)(1)(B) in most respects, there is at least

9   one significant distinction that Rio fails to identify which only strengthens the Trustee's

10  affirmative case for summary judgment.  Because the Trustee has shown that the Debtor was

11  insolvent at the time of each transfer, and Rio agrees there was no fair consideration for the

12  transfer, the burden under CUFTA now shifts to Rio to affirmatively prove that the Debtor was

13  solvent.  *See Neumeyer v. Crown Funding Corp.*, 56 Cal. App. 3d 178, 190 (1976) ("[U]nder the

14  Uniform Fraudulent Conveyance Act a voluntary conveyance, one made without fair

15  consideration, when the evidence shows that there are existing indebtednesses, is presumptively

16  fraudulent") (abrogated on other grounds, cited in *Kupetz v. Cont'l Illinois Nat. Bank & Trust*

17  *Co.*, 77 B.R. 754, 762 (C.D. Ca. 1987)).  Rio can make no such showing.  Accordingly, the

18  Trustee respectfully requests that summary judgment be granted in his favor in the amount of

19  $10,342,008.

20  **II.      THERE IS NO EVIDENCE OF RIO'S GOOD FAITH, NOR CAN THERE BE**

21  The Trustee has demonstrated why summary judgment is warranted with respect to his

22  affirmative claims against Rio.  Therefore, in order for Rio to prevent the Trustee from

23  succeeding in his summary judgment motion, Rio must show that it accepted the Transfers "in

24  good faith and without knowledge of the voidability" of them. 11 U.S.C. § 550(b).  It is the Rio's

25  burden to show that it accepted the Transfers in good faith. *See In re Richmond Produce Co.*,

1    *Inc.*, 195 B.R. 455, 464 (N.D. Cal. 1996); COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 65.20[1]

2    (2011).  Moreover, as Rio seeks summary judgment on this issue, it must show that there is no

3    genuine issue of fact with respect to whether Rio acted in good faith and this Court must

4    consider all of the evidence related to this issue in a light most favorable to the Trustee.  *See In*

5    *re Cohen*, 236 B.R. 1, 4 (B.A.P. 9th Cir. 1999).

6        **A.**    **Rio's Failure to Comply with Rule 26(e) Mandates A Sanction Under Rule**
     **37(c) Precluding It From Offering Evidence Contrary To Its Sworn**
7                    **Interrogatory Reponses and Responses to the Trustee's Requests to Admit**

8          As discussed above, Rio steadfastly denied throughout fact discovery that, at the time the

9    Transfers were made, it was required to comply with 31 C.F.R. § 103.64, which requires that

10   casinos develop a written program designed to ensure compliance with anti-money laundering

11   laws.[23]  *See supra* at II.F.1.  Rio should therefore be precluded from taking the contrary position

12   advocated for the first time by Rio's rebuttal expert Courtney J. Linn in his Expert Rebuttal

13   report submitted months after general fact discovery had closed, namely that Rio was subject to

14   31 C.F.R. § 103.64.  *See* FED. R. CIV. P. 37(c)(1); *Cambridge Elecs.*, 227 F.R.D. at 333.

15         Rule 26(e) provides that litigants have a continuing duty to seasonably supplement all

16   interrogatories and requests for admission upon learning that their prior responses are either

17   incomplete or incorrect.  FED. R. CIV. P. 26(e)(1).  Should a party fail to abide by Rule 26(e), "the

18   party is not allowed to use that information or witness to supply evidence on a motion, at a

19   hearing, or at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P.

20   37(c)(1).  It is the burden of the party facing sanctions to prove substantial justification or

21   harmlessness. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir.

22   2001).  Absent such a showing, a preclusion sanction under Rule 37(c)(1) is "automatic and

23   mandatory." *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 333 (C.D. Cal. 2004),

24   _____

25   [23] Rio made this claim in both its initial and amended responses to the Trustee's interrogatories,
     and in unqualifiedly denying one of the Trustee's requests for admission. (Wright Decl. Exs. 30-
     32.)

1   *citing Yeti by Molly*, 259 F.3d at 1107; *see also Shalomi v. W. Techs., Inc.*, 2:04-CV-00168, 2007

2   WL 1213686 (D. Nev. Apr. 24, 2007) (Pro, J.) (issuing sanctions pursuant to Rule 37(c) for

3   plaintiffs' failure to abide by Rule 26(a) and granting summary judgment to defendant).

4   Additionally, where a party, in response to a request for admission, fails to admit a fact that is

5   later proved to be true, that party is subject to mandatory sanctions, including the expenses and

6   attorney's fees incurred in making that proof. FED. R. CIV. P. 37(c)(2).

7          The Rio's drastic change in position substantially prejudiced the Trustee, because the

8   Trustee retained expert witnesses and tailored a substantial portion of his litigation strategy to

9   show that Rio failed to comply with these regulations.  Accordingly, Rio should be bound to the

10   position it took throughout discovery – that it did not have to comply with federal anti-money

11   laundering laws – and should not be allowed to put forth testimony that it substantially complied

12   with regulations that it persistently claimed were not applicable.  At the very least, in light of

13   Rio's denial that it was subject to 31 C.F.R. §103.64 in response to a request for admission, the

14   Trustee should be awarded the costs incurred in proving that Rio was subject to federal

15   regulations, including 31 C.F.R. § 103.64. *See* FED. R. CIV. P. 37(c)(2), and that despite the

16   contrary position, Rio ___ asserts, it never complied with the same.  Such costs include, but are

17   not limited to the fees paid to the Trustee's rebuttal expert witnesses on this issue, Alexander

18   Seddio and Peter Djinis, and the Trustee's reasonable attorney's fees associated therewith.[24] *Id.*

19          **B.     Rio Had Reason to Know or Investigate the Illicit Source of the Transfers**

20          The undisputed facts in this action demonstrate that that Rio did not act in good faith.

21   Among the most egregious of the red flags identified above, *supra* at 24-25, is Favata's

22   presentation of millions of dollars of cashier's checks, several of which identified NCM as the

23   source of funds, to Rio to gamble when Favata contemporaneously lacked sufficient credit (low

24   _____

25   [24] Should the Court grant the Trustee's motion under FED. R. CIV. P. 37(c), he respectfully
requests leave to separately file evidence supporting the total amount of the attorneys' fees and
costs incurred on this issue.

1    four figures) to charge his room, meal, entertainment and other incidentals to his credit card.

2    Former Compliance Officer David Darby admitted that had he known at the time that Favata was

3    gambling with high dollar value cashier's checks while his "credit card would shut down all the

4    time," he would have investigated further.  (Wright Decl. Ex. B-61 at 100:5-19.)  Yet the very

5    first of the Transfers was a cashier's check which listed NCM as the purchaser, making it clear

6    that the Rio ignored signs that Favata's funds were improperly obtained from the Debtor.

7    (Thorrodsen Decl. Ex. D-11.)

8          In considering whether a transferee has acted in good faith, "courts look to what the

9    transferee objectively 'knew or should have known' in questions of good faith, rather than

10   examining what the transferee actually knew from a subjective standpoint." *In re Agric.*

11   *Research & Tech. Group, Inc.*, 916 F.2d 528, 535-36 (9th Cir. 1990).  Therefore, the Trustee

12   should recover the Transfers where, as here, the Rio failed to undertake a reasonable

13   investigation or willed itself into indifference.  *See  Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,

14   838 F.2d 890, 897-98 (7th Cir. 1988) ("authority has it that the recipient of a voidable transfer

15   may lack good faith if he possessed enough knowledge of the events to induce a reasonable

16   person to investigate").  "Transferees also have a duty to investigate if there is sufficient

17   information to put the ***transferee on notice that something is wrong***." *In re AVI, Inc.*, 389 B.R.

18   721, 736 (B.A.P. 9th Cir. 2008) (emphasis added); *see also Diaz-Barba v. Kismet Acquisition,*

19   *LLC*, 08-CV-1446 BTM (BLM), 2010 WL 2079738 (S.D. Cal. May 20, 2010) ("Knowledge of

20   the voidability does not require actual knowledge; ***knowledge of facts to induce a reasonable***

21   ***person to investigate is enough***.") (citation and quotation omitted) (emphasis added).  Once the

22   transferee is on notice, a "diligent inquiry" on the part of the transferee is required. *In re Agric.*

23   *Research*, 916 F.2d at 539; *In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir.

24   1996) ("if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent

25   purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is

fraudulent") (citation and quotation omitted) (emphasis in original).  In the context of a casino,

notice of "escalation" in the transferor's "gambling without an equivalent ability to manage the

debt" precludes assertion of the good faith defense.  *In re Video Depot, Ltd v. Hilton*, 186 BR

126, 134 (W.D. Wash. 1995).  The Rio, despite having sufficient information to place it on

notice that something was wrong with respect to Favata, failed to engage in a "diligent inquiry."

   The Rio claims, relying primarily on *Bonded*, 838 F.2d at 898, that it was entitled to take

Favata's funds, despite being on notice that those funds originated from NCM, because it was

exempted from conducting an inquiry into Favata.[25]  (Rio Good Faith Mem. at 16)  However,

unlike *Bonded*, where the Seventh Circuit found that Illinois' adoption of the Uniform

Fiduciaries Act relieved the bank from conducting an inquiry into the authority of the fiduciary

signing the check, *id.*, the Rio can cite no authority which exempts a Nevada casino from

inquiring as to the source of funds where it is on notice of nefarious activity.  To the contrary, the

Rio was affirmatively required by a federal regulatory scheme to institute a written risk based

compliance program to detect suspicious activities and aggregate information about suspicious

gambling activity in one place so that all of the suspicious circumstances surrounding Favata's

activities could be considered. 31 C.F.R. § 103.64.  The Rio failed to satisfy those obligations

here.  Moreover, the Rio's argument, that paying personal gambling debts "with corporate

checks is commonplace should not constitute a defense for a casino." *In re Video Depot, Ltd.*,

186 B.R. 126, 135 (W.D. Wash. 1995).  From the day that Favata presented the very first

cashier's check to the Rio, which indicated that NCM was the purchaser, the Rio was on notice

that NCM was the source of the Transfers. (Thorrodsen Decl. Ex. D-11.)  At that point, the Rio

was in possession of facts sufficient to suggest that the Transfers were voidable.

---

[25] In *Bonded*, an executive of the debtor transferred $200,000 of the debtor's funds to himself by issuing a company check, accompanied by a memorandum from the debtor's manager authorizing the transfer, to the defendant bank. 838 F.2d at 898.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

**C.      Rio's Failure to Comply with Standards Mandated by Federal Law Precludes its Claim of Good Faith**

The good faith defense is not available to a transferee such as Rio who, by failing to comply with industry regulations and standards, has "put on 'blinders' prior to entering into transactions ... where circumstances would place the transferee on inquiry notice." *In re Evergreen Security, Ltd.*, 319 B.R. 245, 254 (M.D. Fla. 2003); *see also In re Model Imperial, Inc.*, 250 B.R. 776, 797-98 (S.D. Fla. 2000) (failing to comply with industry standards and violating its own written policies resulted in unavailability of good faith as a defense for transferee bank).  To the contrary, courts have refused to allow a casino like Rio to avail itself of the good faith defense where the casino failed to follow its own internal procedures and those of the casino industry.  See *In re Armstrong*, 285 F.3d 1092, 1098 (8th Cir. 2002) (upholding the finding that Harrah's casino, Rio's parent company, could not avail itself of good faith as a defense due to failure to follow industry standards and internal procedures) (aff'g *In re Armstrong*, 231 B.R. 739 (Bankr. E.D. Ark. 1999)).

Rio's case rests entirely on the conclusory (and nearly identical) statements of Ortzman, Rio's 30(b)(6) witness on Rio's alleged compliance with applicable anti-money laundering regulations who verified Rio's interrogatory responses (Wright Decl. Ex. B-52 at 6:23-7:17); Greenbaum, whose deposition testimony is more remarkable for what he did not recall than what little he did about Favata (Greenbaum Tr. ); Patent, who testified that he contacted Caesar's Palace, where he knew Favata had gambled previously, when he suspected Favata was an illegal bookmaker (*Id.* Ex. B-58 at 59:14-63:15); and Nevada Gaming regulation expert, Amerine, whose testimony supports the Trustee's case more than Rio's and directly contradicts his affidavit in support of Rio's motion (*Id.*  Ex. B-64 at 61:4-65:3, 213:2-215:24.)  But had Rio undertaken any effort to follow federal regulations applicable to all casinos as of March 23, 2003 with respect to Favata's transactions at Rio, it would have been placed on actual notice of Favata's fraud. Because the Rio was placed on inquiry notice, it cannot avail itself of good faith

as a defense. *In re Evergreen Security, Ltd.*, 319 B.R. at 255 (where defendant transferee failed to perform due diligence, good faith was not demonstrated and § 548(c) defenses were therefore unavailable).

### D. The Rio's Constructive Notice of Favata's Fraud Allows the Trustee to Recover under CUFTA

CUFTA, like the Federal scheme governing fraudulent transfers, provides an affirmative defense to transferees who accept a potentially voidable transfer "in good faith and for a reasonably equivalent value[.]" CUFTA § 8(a). As with the Federal fraudulent transfer statute, a transferee "lacks the good faith that is essential to the UFTA § 8(a) defense to voidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction." *In re Cohen*, 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996); *see also CyberMedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1075 (N.D. Cal. 1998) ("a transferee's knowledge of facts evidencing fraud in the transfer may be sufficient to strip the transferee of good faith even in the absence of actual collusion or active participation"); CUFTA §8(a), comment (2) ("Knowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee."). This type of "inquiry notice," similar to inquiry notice as applied to 11 U.S.C. § 550(b), "suffices on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye." *In re Cohen*, 199 B.R. at 719. It is the Rio's burden to prove good faith under CUFTA § 8(a). *Id.*

Rio incorrectly asserts, relying principally upon *Lewis v. Superior Court*, 20 Cal. App.4th 1850 (1994), that to avail itself of the CUFTA good faith defense it need only show that it did not "collude with" or "actively participate" in Favata's fraudulent schemes. However, the Rio's blinkered reliance on *Lewis* ignores both the decision in *In re Cohen*, 199 B.R. 709, and the Northern District of California's reconciliation in *CyberMedia, Inc.*, 19 F. Supp. 2d 1070 of the seemingly contrary positions. In *CyberMedia, Inc.*, the Northern District of California reconciled the positions of *Lewis* and *In re Cohen*, by holding that under CUFTA "a transferee

1  lacks good faith if he or she (1) colludes with the debtor or otherwise actively participates in the

2  debtor's fraudulent scheme, or (2) has *actual knowledge* of facts which would suggest to a

3  reasonable person that the transfer was fraudulent." *CyberMedia, Inc.*, 19 F. Supp. 2d at 1075

4  (emphasis in original).[26]

5        In sum, the cases cited by the Rio to suggest that CUFTA does not allow for inquiry

6  notice occurred outside of the bankruptcy context and presented no action by the defendants

7  similar the willful ignorance exhibited by the Rio in this case.  Accordingly, in considering the

8  Rio's good faith defense under CUFTA § 8(a), this court should apply an inquiry notice standard

9  and find that the Rio's failure to investigate the many indicia of Favata's fraud preclude it from

10  asserting the good faith defense. *See In re Cohen*, 199 B.R. at 719.

## CONCLUSION

12       Based upon the foregoing, the Trustee respectfully requests that the Court grant the

13  Trustee's counter-motions for Summary Judgment on his Fraudulent Conveyance Claims, for

14  Summary Judgment dismissing Rio's Good Faith Defense and for sanctions pursuant to Fed. R.

15  Civ. P. 37(c), while denying Rio's Motion for Summary Judgment with Respect to the Trustee's

16  Affirmative Claims for Actual and Constructive Intent Fraudulent Transfer and its Motion for

17  Summary Judgment on the Good Faith Defense, together with such other and further relief that

18  this Court deems just and proper.

---

[26] *Lewis* is also factually and procedurally distinguishable.  *Lewis* did not raise CUFTA in the bankruptcy context and instead dealt with the sale of real property, which was subject to an improperly indexed lis pendens. *Lewis*, 30 Cal. App.4th at 1857-58.  The *Lewis* court determined that the purchasers of the property had undertaken a reasonable inquiry as to the status of the property, by obtaining title insurance and investigating the status of the title, and overturned the trial court's determination that such an inquiry was insufficient. *Id.* at 1859  The Rio's reliance on *Annod Corp. v. Hamilton & Samuels*, 100 Cal. App.4th 1286 (2002), is similarly unavailing. There, in response to a CUFTA claim outside of the bankruptcy context, the Fourth District Court of Appeal determined that relatively modest draws taken by partners of a struggling law firm amounting to a small fraction of the billings generated by each partner were made in good faith and could not be recovered as fraudulent transfers by the law firm's landlord.

DATED this 19th day of September, 2011.

BAILEY❖KENNEDY

By: /s/ Brandon P. Kemble
    JOHN R. BAILEY
    DENNIS L. KENNEDY
    BRANDON P. KEMBLE
    8984 Spanish Ridge Avenue
    Las Vegas, Nevada 89148

BIJAN AMINI
LITA BETH WRIGHT
JASON LEVIN
STORCH AMINI & MUNVES PC
140 East 45th Street
New York, NY 10017

*Attorneys for Plaintiff*
John P. Brincko, Chapter 11 Trustee

# CERTIFICATE OF SERVICE

In accordance with Fed. R. Civ. P. 5, I certify that I am an employee of Bailey❖Kennedy and that on the <u>19th</u> day of August, 2011, a copy of the foregoing OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION DEFENDANT RIO PROPERTIES INC.'S TWO MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE TRUSTEE'S COUNTER-MOTION FOR SUMMARY JUDGMENT ON HIS FRAUDULENT CONVEYANCE CLAIMS, FOR SANCTIONS PURSUANT TO RULE 37(c) AND DISMISSING RIO'S GOOD FAITH DEFENSE -- FILED UNDER SEAL PURSUANT TO COURT ORDER DATED AUGUST 11, 2011, (Docket No. 181)  was served on the parties by filing and serving the same using the ECF system or by United States mail postage prepaid as follows:

James D. Boyle
SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, NV 89101

James P. Fogelman
Oscar Garza
Samuel A. Newman
Genevieve G. Weiner
Shannon E. Mader
GIBSON DUNN & CRUTCHER, LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Attorneys for Defendant
RIO PROPERTIES INC. d/b/a RIO SUITE
HOTEL & CASINO


/s/ Cheryl Snider
Cheryl Snider, an Employee of
BAILEY❖KENNEDY