1

2

3

UNITED STATES DISTRICT COURT

4

DISTRICT OF NEVADA

5

\* \* \*

6

| | |
|---|---|
| In Re: | ) |
| | ) |
| NATIONAL CONSUMER MORTGAGE, LLC, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| JOHN P. BRINCKO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RIO PROPERTIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

7

8

9

10

11

12

13

14

15

2:10-CV-00930-PMP-PAL

ORDER

16        Presently before the Court is Defendant Rio Properties, Inc.'s ("Rio") Motion for

17   Summary Judgment on the Actual and Constructive Intent Fraudulent Transfer Claims

18   (Doc. ##183-187), filed on August 15, 2011.  Also before the Court is Rio's Motion for

19   Summary Judgment on the Good Faith Defense (Doc. ##189-193), filed on August 15,

20   2011.  Plaintiff John P. Brincko ("Trustee") filed an Omnibus Opposition, a Countermotion

21   for Summary Judgment on the Fraudulent Transfer Claims and Rio's Good Faith Defense,

22   and a Motion for Sanctions (Doc. ##217-224) on September 19, 2011.  Rio filed a Reply in

23   support of its Motions for Summary Judgment and an Opposition to the Trustee's

24   Countermotion (Doc. #226) on October 19, 2011.  Rio also filed an Opposition to the

25   Trustee's Motion for Sanctions (Doc. #229) on October 19, 2011.  The Trustee filed a

26   Reply in support of its Countermotion for Summary Judgment and its Motion for Sanctions

(Doc. #231) on November 3, 2011.

Also before the Court are Rio's Motions in Limine to Exclude the Expert Testimony of Robert Leahy, Alex Seddio, and Peter Djinis (Doc. ##204-206), filed on September 1, 2011.  The Trustee filed an Omnibus Opposition to Rio's Motions in Limine (Doc. #228) on October 19, 2011.

## I. BACKGROUND

The parties are familiar with the facts of this case and the Court will not repeat them here except where necessary.  The parties have submitted nearly 400 pages in briefs and over 6,800 pages of exhibits.  As Magistrate Judge Leen stated in a prior Order (Doc. #156) in this case, the Court does not have the time and resources to systematically cite to the entire record to resolve the pending motions.

Debtor National Consumer Mortgage, LLC ("NCM") is a California limited liability company that operated a mortgage broker business beginning in 2001.  NCM was owned by Sandra Favata and Dorothy Morisette ("Morisette").  Salvatore Favata, also known as Sam Favata ("Favata"), is the husband of Sandra Favata, and the son of Morisette.  Although Favata was not an owner or named officer of NCM, Sandra Favata and Morisette turned financial control of NCM over to Favata.

In 2004, NCM created a division called the Private Money Group, through which Favata solicited investments from individuals for funding residential mortgages which were supposed to be secured by deeds of trust, but generally were not.  Funds from the investors were deposited into NCM's bank account and commingled with NCM's other funds obtained through the mortgage broker business.

On April 3, 2006, NCM filed for bankruptcy, and the Trustee subsequently was appointed for the debtor's estate.  The Trustee initiated this adversary proceeding against Rio in the United States Bankruptcy Court for the Central District of California on April 2, 2008.  (Compl. (Doc. #36).)  In the adversary proceeding, the Trustee alleges that Favata

operated the Private Money Group as a Ponzi scheme.  The Trustee further contends Favata wrote NCM business checks to himself for over $10 million, used those funds to purchase 66 cashier's checks from several banks made payable to himself, put those checks on deposit at the Rio, and then gambled the proceeds at the Rio's sports book.  Through this adversary proceeding, the Trustee seeks to recover the $10 million from the Rio under the bankruptcy code and California's Uniform Fraudulent Transfer Act ("CUFTA").  Rio denies it must return the funds to the bankruptcy estate, contending, among other things, that it verified the cashier's checks were legitimate, and it therefore is a good faith transferee.

On March 29, 2010, the United States District Court for the Central District of California granted Rio's motion to withdraw the reference of the adversary proceeding from the bankruptcy court.  (Order (Doc. #28).)  The Trustee thereafter filed an Amended Complaint alleging claims for actual intent fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550 (count one), constructive fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(B) and 550 (count two), avoidance of actual intent fraudulent transfers under 11 U.S.C. §§ 544 and 550 and California Civil Code § 3439.04(a)(1) (count three), and avoidance of constructive fraudulent transfers under 11 U.S.C. §§ 544 and 550 and California Civil Code § 3439.04(a)(2) (count four).  (Second Am. Compl. (Doc. #40).)  Rio filed an Answer in which it raised the affirmative defense of good faith.  (Am. Answer (Doc. #71) at 5-6.)  On June 10, 2010, the United States District Court for the Central District of California granted Rio's motion to transfer venue to this Court.  (Order (Doc. #109).)

Rio filed two motions for summary judgment.  In its first Motion, Rio argues the Trustee cannot establish a prima facie case of actual or constructive fraudulent transfers.  In its second Motion, Rio argues it is entitled to summary judgment on its good faith defense.  The Trustee opposes Rio's Motions and countermoves for summary judgment on the same

issues.  Rio also filed related motions in limine to exclude the Trustee's experts' reports and testimony, which the Trustee opposes.

**II.  MOTIONS TO EXCLUDE**

Federal Rule of Evidence 702 permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable.  The trial court acts as a "gatekeeper" to exclude expert testimony that is not both relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).

Testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (stating testimony is relevant if it "logically advances a material aspect of the proposing party's case").  To be helpful to the jury, the testimony must be "'tied to the facts'" of the particular case.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Expert testimony is reliable if it is "based on sufficient facts or data," "the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology."  Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1192 (9th Cir. 2007) (quotation omitted).  The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.

Whether to admit expert testimony, as well as deciding how to determine the testimony is reliable, lies within the trial court's discretion.  Kumho Tire, 526 U.S. at 152; United States v. Calderon-Segura, 512 F.3d 1104, 1109 (9th Cir. 2008).  The party offering

the expert testimony bears the burden of establishing its admissibility.  <u>Lust By & Through</u> <u>Lust v. Merrell Dow Pharms., Inc.</u>, 89 F.3d 594, 598 (9th Cir. 1996).

### A. Rio's Motion to Exclude Alex Seddio's Testimony

Rio moves to exclude the report and testimony of the Trustee's expert, Alex Seddio ("Seddio").  Rio argues Seddio is not qualified to opine on the good faith inquiry of what a reasonable Las Vegas casino would have done during the relevant time because he has no familiarity with the standards and practices of Las Vegas casinos.  Rio also argues Seddio's testimony is irrelevant because the federal anti-money laundering regulations are irrelevant, as the Trustee does not and cannot bring a federal money laundering claim against Rio.  Rio also argues Seddio's testimony consists of inadmissible conclusions because Seddio does not identify at what point in time Rio was on inquiry notice; rather, Seddio does a totality of the circumstances analysis based on hindsight.  Rio also contends Seddio's testimony consists of inadmissible legal opinions about what the federal anti-money laundering regulations require.  Rio further contends Seddio improperly relied on another expert for the Trustee, Robert Leahy ("Leahy"), to opine Favata engaged in structuring, even though Leahy admitted he was not an expert in structuring.

Finally, Rio argues the probative value of Seddio's testimony is substantially outweighed by the risk of prejudice, confusion, and misleading the jury.  Specifically, Rio argues Seddio's testimony will confuse the jury into thinking Rio is on trial for violating the anti-money laundering regulations.  Additionally, Rio contends allowing testimony on the alleged connection between money laundering and the September 11 attacks is prejudicial.

The Trustee responds that Rio improperly attempts to change the good faith standard from what a reasonable casino would have done to what other Las Vegas casinos were doing at the relevant time.  The Trustee argues Seddio properly opines that the federal regulations applied to all casinos nationwide, and imposed obligations upon all casinos which, had Rio complied, would have raised red flags to the Rio regarding Favata's

activities.  The Trustee contends Seddio therefore does not need specific experience or knowledge regarding the actual practices of Las Vegas casinos.  The Trustee argues Rio has offered experts on whether Rio acted in good faith, and the experts at least in part rely on Rio's compliance with Nevada regulations.  The Trustee contends he therefore may offer Seddio as a rebuttal witness to opine that Rio failed to comply with other applicable regulations, and therefore Rio did not act in good faith.

As to Seddio's report being conclusory, the Trustee contends Seddio explained what he meant by totality of the circumstances, and identified that Rio was suspicious of Favata from the time it filed a Suspicious Activity Report against him prior to any of the transactions at issue in this case.  As to Seddio offering legal opinions, the Trustee argues that expert testimony which opines Rio failed to comply with industry standards properly may include testimony related to whether Rio complied with applicable legal requirements.  As to Seddio's reliance on Leahy, the Trustee argues Leahy's charts and summaries are admissible, and are based on Rio's own data.  The Trustee notes that Leahy is not an expert on structuring, but Seddio is, and he properly relied on Leahy's analysis of the data to reach an opinion on structuring.

Finally, as to the probative value being outweighed by prejudice, the Trustee argues that Rio put the issue of whether it complied with all applicable regulations at issue in its good faith defense, and therefore the Trustee is entitled to respond.  As for the September 11 attacks, the Trustee argues revealing the history of federal regulations will not evoke an emotional response in the jury.

Rio's argument regarding Seddio's lack of familiarity with the standards and practices of Las Vegas casinos rests on Rio's erroneous statement of the applicable standard.  The standard is not, as Rio put it, what other Las Vegas casinos "would have done (or did do) under similar circumstances," or "whether the Rio's actions were consistent or inconsistent with other Las Vegas casinos."  (Rio's Mot. in Lim. to Exclude

Alex Seddio (Doc. #205) at 13 & 16 n.4.)  The good faith inquiry, as set forth more fully below, is what a reasonable casino would do, not what Las Vegas casinos actually were doing.  Seddio opines a reasonable casino would comply with federal anti-money laundering standards that applied to the Rio, other casinos, and other financial institutions regardless of geographic location within the United States.  To the extent the casinos' actual practices bear on this analysis, Rio's criticism goes to the weight of Seddio's testimony, not its admissibility.  The Court therefore will not exclude Seddio's report based on a lack of familiarity with the practices of Las Vegas casinos during the relevant time frame.

For similar reasons, the Court rejects Rio's argument that Seddio's testimony regarding the federal anti-money laundering regulations is irrelevant.  The Trustee does not assert a federal money laundering claim against Rio.  Rather, the Trustee offers Seddio's testimony regarding the federal regulations to rebut Rio's good faith defense which is based, at least in part, on Rio's own expert testimony that Rio acted in good faith as shown by its compliance with applicable Nevada regulations.  Rio's expert testified that Nevada gaming law would require casinos to comply with federal regulations.  (Trustee's Omnibus Mem. P. & A. in Opp'n to Rio's Three Mots. in Limine (Doc. #228) ["Trustee's Limine Opp'n"], Ex. A-1 at 213-14.)  Other courts have looked to a casino's compliance with applicable regulations as part of the good faith inquiry.  See In re Armstrong, 285 F.3d 1092, 1094, 1096-98 (8th Cir. 2002) (finding casino did not act in good faith based in part on casino's failure to comply with Louisiana gaming regulations).  Seddio's opinion that a reasonable casino would comply with applicable federal anti-money laundering regulations therefore is relevant.

Moreover, such testimony is not inadmissible legal opinion testimony.  See Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (holding an expert's opinion that the defendants "deviated from industry standards" was admissible so long as the expert did not "reach[] a legal conclusion that Defendants actually acted in

bad faith"). Rio's own expert on good faith offered opinions on Rio's compliance with Nevada regulations. Rio's other criticisms, including that Seddio's opinions do not comport with his prior experience regarding money laundering behavior, go to the weight of Seddio's testimony, not its admissibility. The Court therefore will not exclude Seddio's report for reaching improper legal conclusions.

Additionally, the Court will not exclude Seddio's testimony based on Seddio not identifying a precise point in time Rio was on inquiry notice. It is for the fact finder to determine when along the continuum, if ever, Rio acted in bad faith, and Seddio's testimony may assist the fact finder in making this determination. Rio's argument on this point goes to the weight, not the admissibility, of Seddio's testimony. United States v. Rahm, 993 F.2d 1405, 1412 (9th Cir. 1993) ("Absolute certainty of result is not required for admissibility" of expert opinions. (quotation omitted)).

The Court also rejects Rio's argument that Seddio improperly relied on Leahy's report for the underlying data because Leahy is not an expert in structuring. The Trustee does not offer Leahy as an expert in structuring. Seddio is offered as an expert in structuring, and Rio does not offer any argument, authority, or evidence that Seddio could not rely on Leahy's data analysis to reach his opinion on structuring. The Court therefore will not exclude Seddio's report for relying on Leahy's report.

Finally, the probative value of Seddio's testimony is not substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. See Fed. R. Evid. 403. The jury will be instructed on the appropriate legal standards governing the claims the Trustee is asserting against Rio. Rio argues it acted in good faith as demonstrated by its compliance with applicable regulations. The Trustee may attempt to rebut that defense with evidence that Rio did not comply with all applicable regulations. The Court therefore will deny Rio's Motion on this basis.

///

However, the Court agrees with Rio that any testimony referencing the alleged connection between money laundering and the September 11, 2001 terrorist attacks is of little to no probative value, and is substantially outweighed by potential prejudice. The reason the federal government enacted the regulations is irrelevant to whether Rio complied with those regulations and any consequent impact Rio's noncompliance may have on the issue of good faith in this fraudulent transfer action. Seddio can identify the regulations and when they went into effect without tying the regulations to the September 11 attacks. The Court therefore will grant Rio's Motion to Exclude Seddio's testimony to the extent Seddio references the September 11 terror attacks.[1]

**B. Rio's Motion to Exclude Robert Leahy's Testimony**

Rio moves to strike the testimony of the Trustee's other expert, Leahy,[2] on a variety of grounds. The Trustee opposes.

1. Qualifications

Rio argues Leahy is not qualified as an expert because he is not a certified public accountant, and thus he is not qualified to opine on whether Rio complied with Generally Accepted Accounting Principles ("GAAP"). Rio also argues Leahy is not qualified because he is not a lawyer, he has never worked for FinCEN or the Treasury Department, and he admitted he is not an expert on structuring. Rio thus contends Leahy is not qualified to opine on whether Favata engaged in structuring. Next, Rio argues Leahy has never worked

---

[1]  Rio also moves to exclude the testimony of Peter Djinis ("Djinis"), another expert of the Trustee. However, the Trustee does not rely upon Djinis's testimony in either his opposition to Rio's Motions or in support of his own Countermotion for Summary Judgment. The Court therefore will deny Rio's Motion to Exclude Djinis's testimony as moot, without prejudice to renew at trial.

[2]  On January 8, 2013, the Trustee informed the Court that Leahy passed away. (Letter (Doc. #245).) Given the lack of a comparable expert by Rio and the Court's ruling denying Rio's Motion to Exclude, it is unclear whether a replacement expert will be necessary or whether Leahy's deposition testimony will suffice for trial. However, should a motion for a replacement expert be filed, the Court will refer the matter to the Magistrate Judge.

for a Las Vegas casino and has no knowledge of casino practices during the relevant time frame, and thus Leahy is not qualified to opine on what a reasonable casino would have done during the relevant time period.  Finally, as to qualifications, Rio argues Leahy is not an expert on the handling of cashier's checks, as he has no experience in the matter.

The Trustee responds that Leahy is not offering an opinion on whether Rio complied with GAAP, whether Favata was engaged in structuring, or on cashier's check handling procedures, and thus these arguments are irrelevant.  The Trustee argues Leahy is qualified to opine on what a reasonable casino would have done because of his extensive experience in internal controls in the gaming industry.  The Trustee contends the geographic location of a casino is irrelevant to this inquiry.

Rio does not provide any evidence that Leahy is opining that Rio failed to comply with GAAP, that Favata was engaged in structuring, or on any topic regarding Rio's cashier's check handling procedures.  The Trustee denies Leahy will offer opinions on these subjects.  The Court therefore will deny Rio's Motion to Exclude on these grounds as moot.

As to whether Leahy is qualified to construct financial analyses and draw conclusions therefrom, Leahy has an accounting degree.  He was employed for over nine years with a gaming resort, and held positions such as Manager of Information Technology, Director of Accounting and Operational Analysis, Vice President of Finance, and Vice President of Process Improvement.  Leahy currently is employed for a company which owns, operates, and manages casino resort properties.  Through his positions, Leahy has acquired experience in preparing and reviewing financial reports, operating analyses, financial data, operating data, and internal controls within the gaming industry setting.  Leahy has reviewed company internal controls and has received training on the subject throughout his career.

Rio does not dispute Leahy's qualifications except to note that Leahy has not worked for any Las Vegas casinos.  Rio's insistence that Leahy must have Las Vegas casino

experience is based on Rio's erroneous statement of the good faith standard, as discussed above with respect to Seddio.  Leahy need not have worked for a Las Vegas casino to opine on the internal controls or financial and operational data of casinos generally, and Rio does not identify any difference between Las Vegas casinos and other casinos which would render Leahy's testimony inadmissible.  The Court therefore will deny Rio's Motion to Exclude on this basis.

### 2.   GAAP

Rio argues Leahy's opinions lack a reliable foundation because although Leahy testified he prepared a financial analysis in conformity with GAAP, he could not identify what GAAP standards would require Rio to prepare such an analysis.  The Trustee responds that Leahy identified the methodology he used, and that Rio does not dispute Leahy's calculations are accurate.

Leahy does not opine that GAAP required Rio to perform the analyses he performed.  Rather, he testified that he performed his own analysis in conformity with GAAP.  Leahy described the processes he used to create his graphs, which are visual summaries of information Leahy obtained from Rio.  (Trustee's Limine Opp'n, Ex. A-13 at 72-74, 78-79.)  Specifically, Leahy identified his methodology as "accounting for financial analysis," and he described that analysis.  (Id. at 78-80.)  Rio does not dispute the accuracy of any of Leahy's calculations or graphs.  Because Leahy does not offer the opinion to which Rio objects, Leahy describes his methodology, and Rio does not dispute the accuracy of Leahy's calculations or graphs, the Court will deny Rio's Motion to Exclude on this basis.

### 3.  Opinions on Rio's Management

Rio argues Leahy's opinions about what Rio management should have done lack a reliable foundation because Leahy has no experience in the operation and management of Las Vegas casinos.  The Trustee responds that Leahy does not need experience in Las

Vegas casino management because the internal control principles about which he is opining would apply to any casino, regardless of geographic location.

As discussed above, Leahy need not have experience specifically related to Las Vegas casinos. Rio's argument is based on its erroneous statement of the applicable standard, and Rio does not identify any material difference between Las Vegas casinos and other casinos that would render Leahy's testimony inadmissible. The Court will deny Rio's Motion to Exclude on this basis.

### 4. Assisting the Trier of Fact

Rio argues Leahy's proposed testimony is not helpful to the jury in resolving the issues in the case because the activity in a customer's front money account or the amount of complimentary services he received from the casino have no bearing on whether Rio acted in good faith in cashing Favata's cashier's checks. Additionally, Rio contends Leahy's report is nothing more than "simple math" that is not helpful to the jury. The Trustee responds that Leahy's testimony would assist the jury in providing a summary of Rio's financial records, as well as the conclusions Leahy drew from that analysis.

As an initial matter, if Leahy's charts and graphs are the result of "simple math," they would be admissible as summary or calculation evidence as a compilation of Rio's source materials. See Fed. R. Evid. 1006. Moreover, Leahy testified that to create the charts and tables he created, a person would need an understanding of accounting, gaming, and how to operate the software application he used. (Trustee's Limine Opp'n, Ex. A-13 at 75.) Further, the extent to which certain data within Leahy's analyses and opinions impacts the question of Rio's good faith goes to the weight, not admissibility, of Leahy's testimony. The Court therefore will deny Rio's Motion to Exclude on this basis.

### 5. Probative Value

Rio argues the probative value of Leahy's testimony is substantially outweighed by the danger of prejudice, confusion of the issues, and would be misleading to the jury

because a jury might be confused into thinking casinos prepare such charts and Rio failed to comply with GAAP by not doing so, or that Favata was convicted of structuring when he was not.  The Trustee responds that Leahy is not offering an opinion that Las Vegas casinos prepare such charts or that Favata was convicted of structuring.

As discussed previously, Leahy testified he was not opining Rio should have compiled these exact reports.  Rather, he testified that Rio had available the same data and, had it analyzed that data, Rio would have discovered significant changes in Favata's behavior or other details about Favata's dealings with Rio.  (See, e.g., Trustee's Limine Opp'n, Ex. A-13 at 81.)  The Court therefore will deny Rio's Motion to Exclude on this basis.

### 6.  Rule 26

Finally, Rio argues Leahy's report does not comply with Rule 26 because his report consists of charts with no meaningful explanation of those charts, such as an explanation of the data or what methodology he used to create each chart.  The Trustee responds that Leahy's report complies with Rule 26, as he provides a thirteen page narrative analysis to explain his charts.

Expert reports are required to eliminate "unfair surprise to the opposing party and [to conserve] resources."  Elgas v. Colo. Belle Corp., 179 F.R.D. 296, 299 (D. Nev. 1998) (quotation omitted).  Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert's written report to contain, among other items, a "complete statement of all opinions the witness will express and the basis and reasons for them."  However, an expert report need not "replicate every word that the expert might say on the stand."  See Walsh v. Chez, 583 F.3d 990, 994 (7th Cir. 2009).  Rather, the expert's report must "convey the substance of the expert's opinion, along with the other background information required by [the rule], so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary."  Id.; see also Fed. R. Civ. P. 26, 1993 advisory comm. n.

Pursuant to Federal Rule of Civil Procedure 37(c)(1):

(1) Failure to Disclose or Supplement.  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
     (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
     (B) may inform the jury of the party's failure; and
     (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

"The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."  R & R Sails, Inc. v. Ins. Co. of Penn., 673 F.3d 1240, 1246 (9th Cir. 2012).  Where the sanction effectively will constitute dismissal of a claim, the Court must consider whether the sanctioned party's actions involved "willfulness, fault, or bad faith."  Id. at 1247.  Additionally, the Court must consider lesser sanctions.  Id.

Here, Leahy's report is inadequate under Rule 26(a)(2)(B).  Leahy's report does not set forth the basis or reasons for his opinions.  Although his report contains a summary in addition to the charts, the summary merely identifies what is in the charts without explaining how Leahy calculated any of the figures represented in the charts.

Nevertheless, the Court finds any such failure was relatively harmless.  Rio has been in possession of Leahy's report since March 2010.  (Stip. (Doc. #96) at 2.)  Rio has presented no evidence that it advised the Trustee during discovery that Leahy's report was inadequate.  Rio had an opportunity at Leahy's deposition to explore the bases for his opinions.  Although Rule 26(a)(2)(B) is designed in part to obviate the need for depositions if the report adequately sets forth the expert's opinions and the bases therefor, Rio presents no evidence that it objected to the report or to deposing Leahy in the absence of a more complete report, or that Rio sought any other relief during the discovery period relating to

the adequacy of Leahy's report.[3]  Instead, Rio waited until the parties had committed

enormous resources to completing discovery and submitting the matter on summary

judgment to object to the adequacy of Leahy's initial report.  Under these circumstances, an

order precluding consideration of Leahy's deposition testimony on summary judgment is

too severe a sanction.

Rule 37(c)(1) allows the Court to consider sanctions other than precluding use of

the inadequately disclosed evidence.  The Court, in its discretion, concludes that in this

case, the sanction of requiring the Trustee to pay the reasonable costs and attorney's fees

associated with Leahy's first deposition is an appropriate sanction.  Given this and other

issues addressed in this Order, the Court concludes a settlement conference in this matter

may be productive, and the Court will refer this action to the Magistrate Judge for a

settlement conference.  Rio shall serve and file a memorandum, supported by an affidavit of

counsel, establishing the amount of fees and costs incurred in the first deposition of Leahy

within fourteen (14) days after the settlement conference to be set in this matter, if no

settlement is reached.  The Court will grant Rio's Motion to Exclude Leahy's testimony

only to this limited extent.  The Motion is denied in all other respects.

## III.  MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An

---

[3] Rio did move to compel further deposition testimony from Leahy after the Trustee's counsel inappropriately advised Leahy not to answer certain questions at Leahy's deposition.  The Magistrate Judge ruled in Rio's favor, allowing for a continued deposition of Leahy.  (Order (Doc. #233).)  The Magistrate Judge also awarded Rio sanctions in the form of reasonable costs and attorney's fees for both the motion to compel and the continued deposition.  (Id.)

issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

Sections 548 and 544 of the Bankruptcy Code allow a bankruptcy trustee to avoid a fraudulent transfer under either federal law or state law.  Under section 548, a trustee may avoid a transfer if the transfer is made within one year[4] of the filing of a bankruptcy petition and the debtor either (1) had actual intent to defraud or (2) received less than reasonably equivalent value in exchange for the transfer and was insolvent, was made insolvent by the transfer, was operating or about to operate without property constituting reasonably sufficient capital, or was unable to pay debts as they became due.  11 U.S.C. § 548(a)(1)(A), (B).

Under section 544, a bankruptcy trustee may avoid a transfer that an unsecured creditor with an allowable claim could have avoided under applicable state law.  Id. § 544(b)(1).  Under CUFTA, a transfer is voidable if the debtor made the transfer (1) with actual intent to defraud or (2) without receiving a reasonably equivalent value in exchange for the transfer and was insolvent, was "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they

---

[4] Section 548 now provides that transfers within two years of the petition are voidable, but at the time NCM filed its petition, the statute provided that transfers within one year of the petition were voidable.

became due."  Cal. Civil Code § 3439.04(a)

Upon avoiding a fraudulent transfer under either section 544 or section 548, a trustee may recover the transferred property or the value thereof from the initial transferee or from any subsequent transferees.  11 U.S.C. § 550(a).  However, a trustee may not recover from "a transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided."  Id. § 550(b)(1); see also Cal. Civ. Code § 3439.08(a) (providing a similar good faith defense under CUFTA).

## A.  The Trustee's Prima Facie Case

Rio contends the Trustee cannot establish his prima facie case for actual intent fraudulent transfer as a matter of law.  First, Rio argues the Trustee cannot show the debtor, NCM, acted with the requisite intent because Favata's intent cannot be imputed to NCM, as Favata was not an officer or director of NCM.  Second, Rio argues that even if Favata's intent can be imputed to NCM, Favata testified he did not intent to hinder, delay, or defraud NCM's creditors.  Third, Rio argues the Trustee is not entitled to the Ponzi presumption, which assumes intent where the debtor operated a Ponzi scheme, because Favata's plea agreement is inadmissible hearsay, and Favata does not admit to a Ponzi scheme in any event.  Rio also contends the Trustee cannot rely on Favata's deposition testimony to establish a Ponzi scheme because Favata testified NCM was operating a legitimate and profitable mortgage brokering business.

As to constructive fraudulent transfers, Rio argues the Trustee cannot show NCM was insolvent at the time of each transfer.  Rio contends the Trustee cannot rely on Favata's plea agreement to establish insolvency because the plea agreement is inadmissible and in any event the plea agreement does not set forth any facts that NCM was insolvent.  Additionally, Rio contends the Trustee cannot rely on Favata's deposition testimony because he testified NCM operated a legitimate and profitable business.  Rio further argues the Trustee cannot rely on a reconstruction of records performed by the Trustee because the

reconstruction is inadmissible as speculative lay opinion testimony.  Rio also argues the reconstruction does not establish insolvency at the time of any particular transfer, even if it were admissible.

The Trustee responds that he has established actual intent fraudulent transfers through Favata's plea agreement, which the Trustee contends is admissible, as well as through Favata's deposition testimony in which he admits he operated a Ponzi scheme through NCM.  The Trustee also contends that even absent the Ponzi presumption, the transfers carry badges of fraud which would support a finding of actual intent.  As to whether Favata's intent can be imputed to NCM, the Trustee contends that Favata had actual and apparent authority to act on NCM's behalf, as demonstrated by the testimony of Sandra Favata and Morisette, who both testified they turned financial control of NCM over to Favata.

As to constructive fraudulent transfers, the Trustee argues Favata's plea agreement and testimony establish insolvency.  Moreover, the Trustee contends the reconstruction is admissible as a summary and conclusions drawn therefrom are admissible as lay opinion that establishes NCM's insolvency.

A trustee can bring fraudulent transfer claims under both section 548 and section 544 based on either actual intent to defraud creditors or constructive fraud.  To establish fraudulent transfers made with the actual intent to hinder, delay or defraud creditors, the Trustee must show (1) the debtor transferred an interest in property to the defendant; (2) the transfer occurred within the applicable time period, and (3) the debtor made the transfer with the actual intent to hinder, delay, or defraud its creditor or creditors.  11 U.S.C. §§ 548(a)(1)(A), 544; Cal. Civ. Code §§ 3439.04(a)(1), 3439.09.  To establish constructive fraudulent transfers, the Trustee must show (1) the transfer involved the debtor's property; (2) the transfer was made within the applicable time period; (3) the debtor did not receive reasonably equivalent value in exchange for the property transferred; and (4) the debtor was

insolvent, was made insolvent by the transaction, was operating or about to operate without property constituting reasonable sufficient capital, or was unable to pay debts as they became due at the time of the transfer.  11 U.S.C. §§ 548(a)(1)(B), 544; Cal. Civ. Code §§ 3439.04(a)(2), 3439.09.

### 1.  The Ponzi Presumption

A Ponzi scheme is "a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture."  Donell v. Kowell, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quotation omitted).  "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."  Id. (quotation omitted); see also In re Slatkin, 525 F.3d 805, 809 n.1 (9th Cir. 2008).  The "mere existence of a Ponzi scheme is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to that section."  In re AFI Holding, Inc., 525 F.3d 700, 704 (9th Cir. 2008) (quotation omitted).  Courts presume actual intent in relation to a Ponzi scheme because the debtor knows at the time of the transfer that the scheme ultimately must collapse.  In re Indep. Clearing House Co., 77 B.R. 843, 860 (D. Utah 1987).  Proof that transfers were made pursuant to a Ponzi scheme likewise establishes insolvency for constructive fraudulent transfers.  Donell, 533 F.3d at 770-71; Warfield v. Byron, 436 F.3d 551, 558-59 (5th Cir. 2006) (stating a Ponzi scheme "is, as a matter of law, insolvent from its inception").

A plea agreement in which the defendant admits he ran a Ponzi scheme is admissible under Federal Rule of Evidence 807, the residual hearsay exception.  In re Slatkin, 525 F.3d at 811-12.  Moreover, a "debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's

fraudulent intent under 11 U.S.C. § 548(a)(1)(A) and California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue." Id. at 814.

Here, Favata's plea agreement is admissible under Federal Rule of Evidence 807. Moreover, even if the plea agreement was inadmissible, Favata reaffirmed the statements in his plea agreement during his deposition in this case.  Rio's argument that Favata did not admit to a Ponzi scheme is meritless.  Favata unambiguously admitted to operating a Ponzi scheme in his plea agreement, and he reaffirmed those admissions at his deposition. Specifically, Favata admitted that from 2000 to 2006, he "used the investment division of NCM to operate a fraudulent scheme that bilked hundreds of investors of sums totaling in excess of $20 million."  (Trustee's Countermot. for Summ. J. (Doc. #217) ["Trustee's Countermot."], Ex. B-25 at 4.)  Favata admitted he (1) "falsely represented that NCM directly loaned money at high rates of return to borrowers who required short term credit," (2) "falsely told investors they could purchase the notes that secured these loans and thus acquire the right to collect the interest payments," and (3) "falsely assured investors that their principal . . . would be returned once the borrower paid off the loan from NCM."  (Id. at 4-5.)  Additionally, Favata admitted that at the time he made these representations to investors, he "knew that the purported private money note investments that he offered to investors simply did not exist," and that he "had neither the means nor the intention of investing his client[']s money as promised."  (Id. at 5.)  Favata further admitted that he falsely promised substantial rates of return and that real property secured the investments. (Id.)

Additionally, Favata admitted he diverted investors' funds to his personal use and also "used investor funds to prevent detection of his scheme.  In particular, he often diverted funds from new investors to feign purported interest payments to the original investors in the scheme.  As a result of these lulling payments, Favata induced many victims to reinvest their principal into the scheme rather [than] withdrawing their funds."  (Id. at 5-

6.)  Favata's admissions are conclusive and preclude relitigation of the issue of whether Favata acted with the requisite intent to defraud.

Favata's admissions also conclusively establish insolvency from the inception of the Ponzi scheme, as a Ponzi scheme is insolvent from its inception as a matter of law.  The mere fact that NCM conducted some legitimate business does not raise an issue of fact as to whether Favata was operating a massive Ponzi scheme.  Rio relies on Favata's testimony that NCM was generating $300,000 per month through its legitimate business to argue NCM was solvent despite the Ponzi scheme.  Favata testified at his deposition that "[a]t one point" the legitimate side of the business was profitable.  (Trustee's Countermot., Ex. B-54 at 183.)  Specifically, Favata testified that from late 2004 until it closed, the legitimate side was doing well, and in the last six months of NCM's business, NCM was generating $250,000 to $300,000 per month in profit from the legitimate side of the business.  (Id. at 184-85.)  However, Favata also testified that from 2002 to February 2005, he had duped investors out of approximately $5 or $6 million dollars through his Ponzi scheme, and as of February 2005, NCM had a $4 million deficit due to the Ponzi scheme.  (Id. at 187-89.)  During the same period when the legitimate side was doing well, the Ponzi scheme grew even more dramatically, as Favata raised about $15 million from February 2005 to the end of 2005.  (Id. at 187-89.)  Profits from the legitimate side may have assisted Favata in extending his scheme, as Favata commingled funds from both sides of the business.  But no genuine issue of fact remains that the legitimate business was dwarfed by Favata's massive Ponzi scheme, and NCM was insolvent from its inception and throughout its existence.[5]

///

---

[5] Rio's reliance on Favata's testimony that someone offered him $10 million for NCM also does not raise an issue of fact as to solvency.  Favata did not disclose the fraudulent nature of his business to the potential purchaser, and thus any purported sales price would be illusory.  Nor is it plausible that Favata would have sold his Ponzi scheme to a legitimate business which would uncover his wrongdoing.

Because no genuine issue of fact remains that NCM was insolvent at the time of each of the alleged transfers, the Trustee is entitled to summary judgment that he has established insolvency for his prima facie case of constructive fraudulent transfers under 11 U.S.C. § 548(a)(2), § 544, and CUFTA § 3439.04(a)(2).  However, as to actual intent fraudulent transfers, Rio disputes whether Favata's intent can be imputed to NCM.

### 2.  Imputation

To be a fraudulent transfer under 11 U.S.C. § 548(a)(1), § 544, and CUFTA § 3439.04(a)(1), the debtor must act with the actual intent to delay, hinder, and defraud its creditors.  Rio contends that even if Favata acted with such intent, NCM did not, as Favata was not an owner, officer, or director of NCM.  The Trustee responds that Sandra Favata and Morisette turned NCM's financial affairs completely over to Favata, and he thus had actual and/or apparent authority to act on NCM's behalf.

A corporation can form intent only through its agents.  Sea Horse Ranch, Inc. v. Superior Court, 24 Cal. App. 4th 446, 456-57 (Cal. Ct. App. 1994).  An agent may have actual or ostensible authority to act on behalf of the corporation.  Cal. Civ. Code § 2298.  "An agency is actual when the agent is really employed by the principal."  Id. § 2299.  "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."  Id. § 2300.

Where an agent acts within the scope of his authority, his acts and knowledge generally are imputed to the principal.  See Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal. App. 4th 658, 679 (Cal. Ct. App. 2005); In re Tran, 301 B.R. 576, 581 (Bankr. S.D. Cal. 2003).  A corporate agent's knowledge is not imputed to a corporation if he is acting adverse to the corporation's interest.  Meyer v. Glenmoor Homes, Inc., 246 Cal. App. 2d 242, 264 (Cal. Ct. App. 1966).  However, a corporate agent's fraud may be imputed to the corporation where the wrongdoer or wrongdoers were the sole

relevant actors for the corporation.  See Peregrine Funding, Inc., 133 Cal. App. 4th at 679-80; Casey v. U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th 1138, 1143-44 (Cal. Ct. App. 2005).  This "sole actor" rule is based on the principle that where the principal grants authority to an unsupervised agent, "the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to act without accountability."  First Nat'l Bank of Cicero v. Lewco Sec. Corp., 860 F.2d 1407, 1417-18 (7th Cir. 1988).

Here, no genuine issue of material fact remains that Favata acted with actual authority in controlling all of NCM's financial affairs.  The fact that Favata was not a named officer or director of NCM is not dispositive.  Rather, the undisputed testimony from Sandra Favata and Favata is that Morisette and Sandra Favata gave Favata complete and unfettered control over NCM's finances.  Favata personally was involved in raising investor funds for NCM and he decided the interest rate to be advertised to investors in the Ponzi scheme.  Favata testified he had authority to make business decisions for NCM and that he did not have to ask Sandra Favata for permission because he "controlled it myself." (Trustee's Countermot., Ex. B-54 at 224-25.)  Morisette signed hundreds of blank checks at a time and turned them over to Favata to run NCM's finances.  (Id. at 70-73.)  Sandra Favata and Favata both testified Favata made decisions regarding the benefits and compensation Sandra Favata received from NCM.  (Id. at 76; Trustee's Countermot., Ex. B-47 at 176.)  Sandra Favata also testified that Favata determined his own compensation from NCM.  (Trustee's Countermot., Ex. B-47 at 176-77.)  Favata likewise testified that he was "in control of the checkbook, the moneys in/moneys out."  (Trustee's Countermot., Ex. B-54 at 69.)  Additionally, Sandra Favata signed a casino credit application with the Rio which identified Sam Favata as being employed by and an owner of NCM.  (Trustee's Countermot., Ex. B-9.)  Rio presents no contrary evidence to suggest Favata was not actually authorized to act on NCM's behalf.

Because Favata had unfettered control over NCM's finances, including decisions regarding compensation to himself, Sandra Favata, and Morisette, he was acting in the course of his employment and within the scope of his authority when he transferred funds from NCM to himself.  The movement of corporate assets and decisions about compensation for owners and employees are ordinary functions of management which typically would be attributed to the company.  The mere fact that Favata performed illegal acts does not mean he acted outside the scope of his authority.  See USACM Liquidating Trust v. Deloitte & Touche, LLP, 764 F. Supp. 2d 1210, 1222-23 (D. Nev. 2011).

However, no genuine issue of fact remains that Favata acted adversely to NCM.  NCM obtained no benefit from Favata's looting of the company through his Ponzi scheme.  Thus, the question which remains is whether Favata was the sole relevant actor at NCM such that his intent should be imputed to the company even though he was acting adverse to NCM's interests.

Viewing the facts in the light most favorable to the Trustee on Rio's Motion for Summary Judgment, a reasonable jury could find Favata was the sole relevant actor at NCM.  Sandra Favata and Morisette, while nominally the owners and controlling members of NCM, granted Favata unfettered and unsupervised control over NCM's finances.  Morisette went so far as to sign hundreds of blank checks for Favata's use to operate NCM.  Neither party points to any evidence that Morisette, had she been aware of the fraud, could or would have stopped it.  As to Sandra Favata, she testified Favata informed her that he did not have the deeds of trust to secure the investments in NCM's Private Money Group approximately four to five weeks after she first learned of an SEC investigation in early to mid January 2006.  (Trustee's Countermot., Ex. B-47 at 267-71.)  Sandra Favata testified she contacted an attorney the next day.  (Id. at 269.)  However, Sandra Favata never turned Favata in to the authorities, and Favata continued to cash cashier's checks at the Rio with funds derived from NCM as late as March 22, 2006.  A reasonable jury therefore could find

24

that Sandra Favata either could not or would not take steps to end Favata's fraudulent behavior even after she became aware of it, and thus find Favata was the sole relevant actor at NCM whose intent should be imputed to NCM.  The Court therefore will deny Rio's Motion on this basis.

Rio contends the Trustee has made inconsistent allegations in this action and a related action against Bank of America, and the Trustee must be bound by his prior allegations regarding the separation between Favata and the debtor NCM.  In the Bank of America action, the Trustee alleged Favata was NCM's agent who acted contrary to the debtor's interest and without the debtor's permission.  (Rio's Mot. Summ. J. (Doc. #189) ["Rio's MSJ"], Ex. B-4.)  However, the Trustee did not allege in the Bank of America action that Favata's intent is not imputable to NCM.  The Trustee's allegations are consistent with his allegations in this action, and with imputation law and its various exceptions.  Moreover, the Trustee can plead in the alternative.  Fed. R. Civ. P. 8(d)(2).

The Court does not find the Trustee must be judicially estopped from asserting Favata's intent is imputable to NCM, as Rio presents no evidence a court accepted a prior clearly inconsistent position or that allowing the Trustee to proceed would give the Trustee an unfair advantage over Rio.  United States v. Ibrahim, 522 F.3d 1003, 1009 (9th Cir. 2008).  Rio argues the Trustee should be judicially estopped because the Trustee survived a motion to dismiss and then settled with Bank of America in the other action.  However, Bank of America moved to dismiss based only on the argument that Bank of America did not have actual knowledge Favata was looting, and therefore it could not have aided and abetted Favata.  (Rio's MSJ, Ex. B-5.)  The Trustee responded by arguing the bank had actual knowledge of facts which put the bank on notice of Favata's activities.  (Id.)  Rio presents no evidence, for example, that in response to an in pari delicto defense raised by Bank of America, the Trustee alleged that Favata's actions could not be imputed to NCM.  Rio presents no prior court order adopting any such position by the Trustee.  Further, a

settlement does not amount to a court adopting the Trustee's purportedly inconsistent position.  To the extent the Trustee's allegations in the Bank of America action are judicial admissions which suggest Favata's intent should not be imputed to NCM, Rio may use them to bolster its position at trial.  However, the Court will deny Rio's Motion for Summary Judgment on the issue.

Viewing the facts in the light most favorable to Rio on the Trustee's Countermotion for Summary Judgment, a reasonable jury could find Favata was not the sole relevant actor at NCM.  Although Favata exercised de facto control, both Morisette and Sandra Favata had actual authority within the company to stop Favata's fraudulent conduct.  Sandra Favata averred in an affidavit that upon learning that the "private money business operated by Sam Favata had problems," she employed an accounting firm to perform an audit, and ultimately filed the petition for NCM's bankruptcy, thus effectively putting an end to Favata's ability to use NCM for fraudulent purposes.  (Trustee's Countermot., Ex. B-23 at 3 ¶ 13.)  A reasonable jury thus could find Favata was not the sole relevant actor at NCM, and his intent should not be imputed to NCM.  The Court therefore will deny the Trustee's Countermotion on this basis.

**B.  Rio's Good Faith Defense**

1.  Trustee's Motion for Sanctions

The Trustee moves for sanctions under Federal Rule of Civil Procedure 37(c) based on Rio's denial throughout discovery that it was not required to comply with the federal anti-money laundering regulation set forth in 31 C.F.R. § 103.64.  The Trustee contends that after discovery closed, Rio took the contrary position via the rebuttal expert report of Courtney J. Linn ("Linn").  The Trustee requests that Rio be bound to its original position in discovery, and that it not be permitted to put forth Linn's testimony that Rio substantially complied with section 103.64.  Alternatively, the Trustee requests costs pursuant to Rule 37(c)(2) for expenses incurred in proving Rio was bound by the regulation.

Rio responds the Court should deny the Motion as procedurally defective because the Trustee did not meet and confer prior to filing the Motion, the Trustee did not move to compel during discovery, a Rule 37(c)(2) motion should be brought only after trial, and Rule 37(c)(2) allows only for costs, not striking of a defense.  On the merits, Rio argues it has not taken any inconsistent positions, as it always has asserted Rio met all standards and practices of Las Vegas casinos at the time.  Rio contends that although it initially contested the application of the federal anti-money laundering statute, it made the decision to narrow the issues for trial by no longer contesting the regulation's application.  Finally, Rio notes that the Trustee previously moved to strike Linn's report before the Magistrate Judge, and, rather than strike Linn's report, the Magistrate Judge allowed the Trustee to submit a rebuttal expert report.  Rio argues the Trustee improperly is seeking reconsideration of the Magistrate Judge's decision.

Pursuant to Federal Rule of Civil Procedure 37(c)(2), where a party fails to admit something in response to a request for admission and the requesting party later proves the matter to be true, the requesting party may move for sanctions in the amount of "the reasonable expenses, including attorneys fees, incurred in making that proof."  The Court must award costs unless the Court finds the request objectionable, the request for admission was immaterial, "the party failing to admit had a reasonable ground to believe that it might prevail on the matter," or the party failing to admit had "other good reason for the failure to admit."  Fed. R. Civ. P. 37(c)(2)(A)-(D).

Because a Rule 37 motion is not a discovery-related motion, the Trustee did not need to meet and confer prior to filing it, nor did he have to move for relief during the discovery period.  Hoffman v. Constr. Protective Servs., Inc., 541 F.3d 1175, 1179 (9th Cir. 2008).  The Court concludes that Rio's refusal to admit during discovery that it was subject to the federal anti-money laundering regulation was relatively harmless.  The Trustee would have conducted extensive discovery on Rio's compliance with the federal anti-money

laundering regulation regardless of whether Rio admitted the regulation applied because a substantial portion of the Trustee's good faith argument is centered on Rio's purported failure to comply with the regulation.  Additionally, the Magistrate Judge lessened any prejudice by allowing the Trustee to file a rebuttal expert report from a new expert in response to Linn's report.  At the hearing before the Magistrate Judge, the Trustee indicated that he did not prefer the remedy of striking the Linn report, but rather preferred getting to the merits of the case and offering his own expert in response.  (Tr. (Doc. #154) at 39-40.)  Finally, the Trustee may explore in front of the jury any inconsistencies in Rio's positions.  To the extent the Trustee seeks, either directly or effectively, to preclude Rio's good faith defense, the availability of monetary sanctions combined with the Trustee's ability to reveal to the jury Rio's positions taken throughout this case are appropriate lesser sanctions.

        The Court therefore will deny the Trustee's Motion for Sanctions to the extent it seeks to preclude the Rio from arguing or presenting evidence on the issue of whether it complied with the federal anti-money laundering regulations.  The Court will deny the Trustee's request for monetary sanctions under Rule 37(c)(2), without prejudice to renew after the parties' settlement conference if no settlement is reached.

                        2.  CUFTA

        Twenty-three of the challenged transfers totaling $2,022,008.21 occurred more than one year prior to the bankruptcy petition date.  (Second Am. Compl., Ex. A.)  These transfers therefore are voidable only under section 544 and the applicable state law, CUFTA as set forth in California Civil Code § 3439.04.  See Pub. L. 109-8 §§ 1402(1), 1406(b)(2) (Apr. 20, 2005) (changing one year clawback period in section 548 to two years for any petition commenced more than one year after April 20, 2005).  The parties disagree about the good faith standard under CUFTA.  Rio argues that under CUFTA, a transferee acts in good faith unless it colludes with or actively participates in the fraudulent scheme.  The Trustee contends CUFTA's standard is the same as the bankruptcy code, and CUFTA thus

denies a good faith defense where the transferee is on inquiry notice that the transfer is actually or constructively fraudulent.

The California Supreme Court has not addressed whether CUFTA's good faith defense applies to any transferee except one who colludes with the transferor or otherwise participates in the debtor's fraudulent scheme. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007) (quotation omitted). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." Id. (quotation omitted).

CUFTA's good faith defense is set forth in section 3439.08(a). Legislative comments to the section state that good faith "means that the transferee acted without actual fraudulent intent and that he or she did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor. The transferee's knowledge of the transferor's fraudulent intent may, in combination with other facts, be relevant on the issue of the transferee's good faith of the transferor or of the transferor's insolvency." Cal. Civ. Code § 3439.08 Leg. Comm. cmt. 1 (1986). The same comment also states that "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." Id.

Relying on the first part of the legislative comment, two California intermediate appellate decisions have held that a transferee acts in good faith unless the transferee colluded with the debtor or otherwise participated in the debtor's fraudulent scheme. See Annod Corp. v. Hamilton & Samuels, 100 Cal. App. 4th 1286, 1299-1300 (Cal. Ct. App. 2002); Lewis v. Superior Ct., 30 Cal. App. 4th 1850, 1858-59 (Cal. Ct. App. 1994). However, the United States Court of Appeals Bankruptcy Appellate Panel for the Ninth Circuit ("Ninth Circuit BAP") and the United States District Court for the Northern District

of California looked to the entire legislative comment and determined that a transferee does not act in good faith under CUFTA if the transferee "(1) colludes with the debtor or otherwise actively participates in the debtor's fraudulent scheme, or (2) has actual knowledge of facts which would suggest to a reasonable person that the transfer was fraudulent." CyberMedia, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1075 (N.D. Cal. 1998) (emphasis omitted); see also In re Cohen, 199 B.R. 709, 719 (9th Cir. BAP 1996).

The Court concludes that if the California Supreme Court addressed the issue, it would adopt the position of the Ninth Circuit BAP and the Northern District of California. Viewing the legislative comment in its entirety, a transferee is not entitled to the good faith defense if it colludes with the debtor or participates in the fraudulent scheme. A transferee's good faith defense also may fail if the transferee had actual knowledge of facts which would suggest to a reasonable person the transfer was fraudulent.

### 3. Bankruptcy Code

The Bankruptcy Code does not define what constitutes good faith. The United States Court of Appeals for the Ninth Circuit has declined to set forth a comprehensive test for good faith, concluding that "good faith is not susceptible of precise definition." In re Agric. Research & Tech. Grp., Inc. ("In re Agritech"), 916 F.2d 528, 536 (9th Cir. 1990) (quotation omitted); see also Donell, 533 F.3d at 771 n.3. Courts are reluctant to establish a singular test for good faith given the "unpredictable circumstances in which the courts may find its presence or absence." In re M & L Bus. Mach. Co., Inc., 84 F.3d 1330, 1335 (10th Cir. 1996) (quotation omitted). Consequently, good faith is a factual question, "determined on a case-by-case basis." In re Sherman, 67 F.3d 1348, 1355 (8th Cir. 1995); In re Armstrong, 285 F.3d 1092, 1096 (8th Cir. 2002).

The good faith inquiry is determined by asking "what the transferee objectively 'knew or should have known' . . ., rather than examining what the transferee actually knew from a subjective standpoint." In re Agritech, 916 F.2d at 535-36. A transferee does not

30

act in good faith if it is on inquiry notice as to either the debtor's fraudulent intent or the debtor's possible insolvency.  See In re Nieves, 648 F.3d 232, 238-39 (4th Cir. 2011) (stating that "a transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency" (quotation omitted)); In re Agritech, 916 F.2d at 539-40 (holding no good faith as a matter of law where evidence showed transferee knew or should have known the debtor was operating a Ponzi scheme).  A transferee thus does not act in good faith if the facts actually known by the transferee, and all reasonable inferences drawn therefrom, would suggest to a reasonable person in the transferee's position that it was receiving a voidable transfer.  In re Bressman, 327 F.3d 229, 236-37 (3d Cir. 2003); In re Agritech, 916 F.2d at 535 (stating "a transferee's knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether [the transferor] intended to delay or defraud his creditors . . . should be deemed to have notice . . . as would invalidate the sale as to him" (quotation omitted)).  Whether a transferee acted in good faith is evaluated in the context of the industry in which the transferee operates.  In re Nieves, 648 F.3d at 239.  The party asserting the good faith defense bears the burden of proving it received the transfer in good faith.  In re Agritech, 916 F.2d at 535 (applying the bankruptcy code); In re Cohen, 199 B.R. at 718-19 (applying CUFTA).

The Trustee presents no evidence and does not argue that Rio actually knew of or participated in Favata's fraudulent scheme.[6]  Consequently, under CUFTA and the bankruptcy code, the only question is whether Rio actually knew of facts which would suggest to a reasonable casino in Rio's position that the transfers were voidable.

Viewing the facts in the light most favorable to the Trustee on Rio's Motion for Summary Judgment, a reasonable jury could find Rio has not established its good faith

---

[6]  Nor does the Trustee argue that Rio did not provide reasonably equivalent value.

defense.  The Trustee has presented evidence that Rio failed to comply with applicable federal regulations, and had Rio done so, it would have discovered that Favata gambled 66 high dollar cashier's checks in two and a half years out of his front money account at the Rio, and wagered over $48 million during this time frame.  Some of those checks identified NCM as the purchaser of the cashier's checks.  Favata gave false information on his application for a front money account at the Rio regarding Favata's relationship to NCM. Favata gambled so extensively at Rio that Rio monitored him because his wagering alone could affect the Rio Sports Book's take.  During the time Favata's gambling dramatically spiked and he gambled millions of dollars at the Rio, Rio knew Favata had a low limit credit card that could not even cover his room and incidentals during his trips to the Rio on more than one occasion.  Rio already suspected Favata of structuring once, and some of his transactions arguably appear to be structuring activity.  Rio also knew the Nevada Gaming Control Board was investigating Favata.  Viewing these facts and others identified in the Trustee's briefs, expert reports, and testimony in the light most favorable to the Trustee in this highly fact-driven, case-by-case inquiry, a reasonable jury could find Rio has not established its good faith defense.  The Court therefore will deny Rio's Motion for Summary Judgment based on the good faith defense.

Viewing the facts in the light most favorable to Rio on the Trustee's Countermotion, a reasonable jury could find Rio acted in good faith.  Rio presented evidence that it verified the cashier's checks with Favata's banks, and no check ever was dishonored or the subject of a stop payment order.  A reasonable jury could conclude that a casino such as Rio reasonably could rely on the nationally recognized banks, who also are subject to the federal anti-money laundering regulations, to vet the source of the funds used to purchase cashier's checks.  Additionally, Rio presents evidence that it did not extend Favata credit, and thus the fact that it did not conduct further investigation of Favata was consistent with how a reasonable casino would behave under the circumstances.  Rio also

presents evidence that even if Rio should have conducted further inquiry, it would not have

uncovered that NCM was a Ponzi scheme or that the source of Favata's funds was illegal

where several different governmental agencies were investigating Favata, and none had

filed charges at any time while Rio was engaging in transactions with Favata.  None of

those governmental agencies advised Rio not to engage in transactions with Favata.

Viewing these facts and others identified in Rio's briefs, expert reports, and testimony in

the light most favorable to Rio in this highly fact-driven, case-by-case inquiry, a reasonable

jury could find Rio has established its good faith defense.  The Court therefore will deny the

Trustee's Countermotion for Summary Judgment based on the good faith defense.

**IV.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Rio Properties, Inc.'s Motion for

Summary Judgment on the Actual and Constructive Intent Fraudulent Transfer Claims

(Doc. ##183-187) is hereby DENIED.

IT IS FURTHER ORDERED that Rio's Motion for Summary Judgment on the

Good Faith Defense (Doc. ##189-193) is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiff John P. Brincko's Countermotion for

Summary Judgment on the Fraudulent Transfer Claims and Rio's Good Faith Defense (Doc.

##217-224) is hereby GRANTED in part and DENIED in part.  The Motion is granted to

the extent that the Trustee has established no issue of fact remains that the debtor was

insolvent at all relevant times for the purpose of the Trustee's constructive fraudulent

transfer claims.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that the Trustee's Motion for Sanctions (Doc.

##217-224) is hereby DENIED without prejudice to move for costs following the settlement

conference, if no settlement is reached.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc.'s Motion in

Limine to Exclude the Expert Testimony of Robert Leahy (Doc. #204) is hereby

GRANTED in part and DENIED in part.  The Motion is granted in that the Court will allow Defendant Rio Properties, Inc. to recover the reasonable costs and attorney's fees associated with the first deposition of Robert Leahy.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc. shall serve and file a memorandum, supported by the affidavit of counsel, establishing the amount of attorney's fees and costs incurred in the first deposition of Robert Leahy within fourteen (14) days following the settlement conference, if no settlement is reached.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc.'s Motion in Limine to Exclude the Expert Testimony of Alex Seddio (Doc. #205) is hereby GRANTED in part and DENIED in part.  The Motion is granted to the extent that Alex Seddio's testimony regarding the relationship between the federal anti-money laundering regulations and the September 11 attacks is excluded.  The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc.'s Motion to Exclude the Expert Testimony of Peter Djinis (Doc. #206) is hereby DENIED as moot, without prejudice to renew at trial.

IT IS FURTHER ORDERED that this matter is referred to United States Magistrate Judge Peggy A. Leen for a settlement conference.

IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order on or before February 18, 2013.


DATED: January 14, 2013

_____
PHILIP M. PRO
United States District Judge